## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CAROL ROSENBERG,
MIAMI HERALD MEDIA
COMPANY,

                  Plaintiffs,

v.

UNITED STATES DEPARTMENT OF
DEFENSE,

                  Defendant.

Civil No. 1:17-cv-437-APM

## MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION
## FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFFS'
## CROSS-MOTION FOR SUMMARY JUDGMENT

David A. Schulz (Bar No. 459197)
919 Third Avenue, 37th Floor
New York, NY 10022
Tel: (212) 850-6103
Email: schulzd@ballardspahr.com

John Langford, supervising attorney
Sebastian Brady (law student intern)
Mike Karpman (law student intern)
Delbert Tran (law student intern)
MEDIA FREEDOM &
    INFORMATION ACCESS CLINIC
ABRAMS INSTITUTE
Yale Law School
P.O. Box 208215
New Haven, CT 06520
Tel: (203) 432-9387

*Counsel for Plaintiffs*

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................... 1

ARGUMENT .................................................................................................................... 6

    I.   THE GOVERNMENT'S RECENTLY HEIGHTENED BURDEN TO WITHHOLD INFORMATION AND THE STANDARD OF REVIEW ............................................ 7

   II.  THE GOVERNMENT FAILS TO DEMONSTRATE THAT  INFORMATION WAS PROPERLY WITHHELD UNDER EXEMPTION 5 ....................................... 10

    A.   The Government Fails to Demonstrate Reasonably Foreseeable Harm to an Interest Protected by Exemption 5 ......................................................................... 11

    B.   The Government Fails To Disclose All Reasonably Segregable Factual Material ...... 17

    C.   The Government Fails To Identify the Pre-Decisional Deliberative Process to Which Withheld Information Relates ................................................................... 18

  III.  THE GOVERNMENT FAILS TO DEMONSTRATE THAT  INFORMATION WAS PROPERLY WITHHELD UNDER EXEMPTION 1 ....................................... 21

    A.   The Government Fails to Justify Withholding Information Characterized as Military Plans, Weapons, or Operations.......................................................................... 23

    B.   The Government Fails to Justify Withholding Information Characterized as Foreign Government Information ................................................................................... 31

    C.   The Government Fails to Justify Withholding Information Characterized as Intelligence Sources and Methods ...................................................................... 33

  IV.  THE GOVERNMENT FAILS TO DEMONSTRATE THAT  INFORMATION WAS PROPERLY WITHHELD UNDER EXEMPTION 6 ....................................... 34

    A.   The Government Establishes No Meaningful Privacy Interest in the Redacted Information ...................................................................................................... 36

    B.   Any Actual Privacy Interest Presented Is Outweighed By The Public's Interest in Disclosure ........................................................................................................ 37

   V.  THE GOVERNMENT FAILS TO DEMONSTRATE THAT  INFORMATION WAS PROPERLY WITHHELD UNDER EXEMPTION 7 ....................................... 38

  VI.  THE COURT SHOULD REVIEW A SAMPLE OF DOCUMENTS *IN CAMERA* 42

CONCLUSION ............................................................................................................... 43

# TABLE OF AUTHORITIES

**Cases**

*Abtew v. U.S. Dep't of Homeland Sec.*,
  808 F.3d 895 (D.C. Cir. 2015) ................................................................. 10, 19

*ACLU v. U.S. Dep't of Def.*,
  628 F.3d 612 (D.C. Cir. 2011) ................................................................. 22, 23, 27

*ACLU v. U.S. Dep't of Def.*,
  229 F. Supp. 3d 193 (S.D.N.Y. 2017) ............................................................ 28

*Allen v. CIA*,
  636 F.2d 1287 (D.C. Cir. 1980) .................................................................... 43

*Am. Immigration Lawyers Ass'n v. Exec. Office for Immigration Review*,
  830 F.3d 667 (D.C. Cir. 2016) ..................................................................... 7, 36

*Army Times Pub. Co. v. Dep't of Air Force*,
  998 F.2d 1067 (D.C. Cir. 1993) ................................................................... 12

*Associated Press v. U.S. Dep't of Def.*,
  462 F. Supp. 2d 573 (S.D.N.Y. 2006) ............................................... 26, 29, 38

*Blackwell v. FBI*,
  646 F.3d 37 (D.C. Cir. 2011) ....................................................................... 40

*Campbell v. U.S. Dep't of Justice*,
  164 F.3d 20 (D.C. Cir. 1998) .............................................................. 22, 29, 31

*Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Justice*,
  160 F. Supp. 3d 226 (D.D.C. 2016) .............................................................. 34

*Coastal States Gas Corp. v. Dep't of Energy*,
  617 F.2d 854 (D.C. Cir. 1980) ........................................................... 7, 17, 19

*Darui v. U.S. Dep't of State*,
  798 F. Supp. 2d 32 (D.D.C. 2011) ............................................................... 33

*Dep't of Air Force v. Rose*,
  425 U.S. 352 (1976) .......................................................................... 9, 36, 38

*Dep't of Interior v. Klatham Water Users Protective Ass'n*,
  532 U.S. 1 (2001) ......................................................................................... 10

*EPA v. Mink*,
   410 U.S. 73 (1973)...................................................................................... 11, 17, 20

*Founding Church of Scientology v. Smith*,
   721 F.2d 828 (D.C. Cir. 1983) ................................................................... 43

*Hayden v. Nat'l Sec. Agency*,
   608 F.2d 1381 (D.C. Cir. 1979) ................................................................. 22

*In re Guantánamo Bay Detainee Litig.*,
   624 F. Supp. 2d 27 (D.D.C. 2009) ............................................................ 38

*In re Sealed Case*,
   121 F.3d 729 (D.C. Cir. 1997) ............................................................ 14, 20

*In re Subpoena Duces Tecum Served on Office of Comptroller of Currency*,
   145 F.3d 1422 (D.C. Cir. 1998),................................................................ 14

*In re Subpoena Served Upon Comptroller of Currency, & Sec'y of Bd. of Governors of Fed.
   Reserve Sys.*, 967 F.2d 630 (D.C. Cir. 1992) ........................................... 15

*Int'l Bhd. of Elec. Workers, Local No. 41 v. U.S. Dep't of Hous. & Urban Dev.*,
   763 F.2d 435 (D.C. Cir. 1985) ................................................................... 38

*Int'l Counsel Bureau v. U.S. Dep't of Def.*,
   723 F. Supp. 2d 54 (D.D.C. 2010) ............................................................ 31

*ITT World Commc'ns, Inc. v. FCC*,
   699 F.2d 1219 (D.C. Cir. 1983)..........................................................11, 17, 20

*Jordan v. U.S. Dep't of Justice*,
   591 F.2d 753 (D.C. Cir. 1978) ............................................................. 13, 16

*Jordan v. U.S. Dep't of Justice*,
   668 F.3d 1188 (10th Cir. 2011) ........................................................... 40, 41

*Judicial Watch, Inc. v. U.S. Dep't of Def.*,
   715 F.3d 937 (D.C. Cir. 2013)...........................................................21, 22, 25

*Judicial Watch, Inc. v. U.S. Postal Service*,
   297 F. Supp. 2d 252 (D.D.C. 2004)........................................................... 19

*Kimberlin v. Dep't of Justice*,
   921 F. Supp. 833 (D.D.C. 1996) ............................................................... 37

*King v. U.S. Dep't of Justice,*
   830 F.2d 210 (D.C. Cir. 1987) ....................................................................... 22

*Larson v. Dep't of State,*
   565 F.3d 857 (D.C. Cir. 2009) ......................................................... 22, 25, 31

*Lesar v. U.S. Dep't of Justice,*
   636 F.2d 472 (D.C. Cir. 1980) ....................................................................... 21

*Mayer Brown LLP v. IRS,*
   562 F.3d 1190 (D.C. Cir. 2009) .................................................................... 42

*Mead Data Cent., Inc. v. U.S. Dep't of Air Force,*
   566 F.2d 242, 260 (D.C. Cir. 1977) ....................................................... 18, 26

*Nat'l Ass'n of Home Builders v. Norton,*
   309 F.3d 26 (D.C. Cir. 2002) ......................................................................... 36

*Nat'l Sec. Counselors v. CIA,*
   960 F. Supp. 2d 101 (D.D.C. 2013) ............................................................. 19

*Nat'l Whistleblower Ctr. v. Dep't of Health & Human Servs.,*
   903 F. Supp. 2d 59 (D.D.C. 2012) ............................................................... 14

*Nation Magazine v. U.S. Customs Serv.,*
   71 F.3d 885 (D.C. Cir. 1995) ........................................................................ 37

*NLRB v. Robbins Tire & Rubber Co.,*
   437 U.S. 214 (1978) ....................................................................................... 20

*NLRB v. Sears, Roebuck & Co.,*
   421 U.S. 132 (1975) ................................................................................. 10, 13

*Paisley v. CIA,*
   712 F.2d 686 (D.C. Cir.1981) ....................................................................... 19

*Pena-Rodriguez v. Colorado,*
   137 S. Ct. 855 (2017) ..................................................................................... 14

*Petroleum Info. Corp. v. U.S. Dep't of the Interior,*
   976 F.2d 1429 (D.C. Cir. 1992) .............................................................. 13, 15

*Pub. Emps. for Envtl. Responsibility v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-*
   *Mexico,* 740 F.3d 195 (D.C. Cir. 2014) .................................................. 42, 43

*Ray v. Turner*,
  587 F.2d 1187 (D.C. Cir. 1978)................................................................. 43

*Russel v. Dep't of the Air Force*,
  682 F.2d 1045 (D.C. Cir. 1982).......................................................... 13, 16

*Senate of the Com. of P. R. on Behalf of Judiciary Comm. v. U.S. Dep't of Justice*,
  823 F.2d 574 (D.C. Cir. 1987)................................................................. 19

*U.S. Dep't of Def. v. Fed. Labor Relations Auth.*,
  510 U.S. 487 (1994)............................................................................... 38

*U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*,
  489 U.S. 749 (1989)............................................................................... 38

*U.S. Dep't of State v. Ray*,
  502 U.S. 164 (1991)................................................................................. 7

*Unrow Human Rights Impact Litig. Clinic v. U.S. Dep't of State*,
  134 F. Supp. 3d 263 (D.D.C. 2015)........................................................ 33

*Wash. Post Co. v. U.S. Dep't. of Health & Human Servs.*,
  690 F.2d 252 (D.C. Cir. 1982)................................................................ 38

*Waters v. U.S. Capitol Police Bd.*,
  216 F.R.D. 153 (D.D.C. 2003)................................................................ 14

*Wolf v. CIA*,
  473 F.3d 370 (D.C. Cir. 2007)................................................................ 10

**Statutes**

5 U.S.C. § 552.................................................................................... *passim*

**Other Authorities**

28 CFR §§ 549.60-549.66........................................................................ 42

Exec. Order No. 13,526, 75 Fed. Reg. 707 (Dec. 29, 2009)........................... *passim*

U.S. Department of Justice, *Guide to the Freedom of Information Act, 2009 Edition* (2009) . 8

## INTRODUCTION

This FOIA lawsuit arises out of a narrow request to defendant Department of Defense ("DoD") for the expedited release of communications between General John Kelly and a top presidential advisor on counterterrorism, at a time when General Kelly was under consideration for appointment as Secretary of the Department of Homeland Security ("DHS").  The requested communications took place over a limited span of time when General Kelly served as Commander of the U.S. Southern Command ("SOUTHCOM"), and they were sought to shed light on how General Kelly was likely to exercise his authority over immigration and other key policy areas as DHS Secretary.

The government failed to meet its statutory obligation to release in a timely manner information directly relevant to an issue of significant debate among the American public. Months later, after General Kelly has already come and gone from the position at DHS, the government continues to resist disclosure of much of the substance of the requested communications without any proper justification.  The requested records remain of intense public interest given General Kelly's current position as White House Chief of Staff, where he plays a continuing role over immigration policy changes that remain at the center of an intense political debate.  As demonstrated below, no proper basis exists for most of the government's refusals to release requested information.

## BACKGROUND

Plaintiffs Carol Rosenberg and the Miami Herald Media Company bring this case to vindicate the public's interest in understanding the views of a controversial public official at the right hand of the President and at the center of several current public controversies.  Rosenberg is

an award-winning reporter for the *Miami Herald*,[1] where since 2001 she has covered the activities of SOUTHCOM generally and its operation of the Guantánamo Bay detention center in particular.  Rosenberg followed General Kelly's career during the years he led SOUTHCOM and had overall operational responsibility for Guantánamo.

General Kelly was elevated to SOUTHCOM Commander in 2012.  Plaintiffs' Combined Statement of Material Facts ("Pls.' SMF") ¶ 54.  His tenure in that position coincided with a variety of controversies at Guantánamo, including a lengthy hunger strike by many Guantánamo detainees, Pls.' SMF ¶ 35, the force-feeding of those striking detainees, Pls.' SMF ¶ 38, General Kelly's decision to black out all coverage of the hunger strike after initially allowing it for months, Pls.' SMF ¶ 37, and a highly controversial military commission injunction prohibiting female troops from touching Muslim detainees, Pls.' SMF ¶ 51.  General Kelly was replaced as Commander of SOUTHCOM in early 2016, and took a significant position at a DoD contractor, DynCorp.  Pls.' SMF ¶ 58.

### A. Rosenberg's FOIA Request

Soon after President Trump's election, it became clear that General Kelly was a leading candidate for a national security-related role in the incoming administration.  Pls.' SMF ¶¶ 55-56.  Because such a role would give General Kelly a significant role in shaping national security policy, Rosenberg believed it to be of the utmost importance that the public understand his views on issues related to these policies.  To this end, Rosenberg formulated a narrow FOIA request

---

[1]  Rosenberg's reporting on Guantanamo has earned her multiple awards, including a 2011 Journalism Award from the Robert F. Kennedy Human Rights organization, Pls.' SMF ¶ 64, a First Amendment award from the Reporters Committee for Freedom of the Press, Pls.' SMF ¶ 65, and an Edward Willis Scripps Award for distinguished service to the First Amendment, Pls.' SMF ¶ 66.

she believed would produce relevant information that would promote informed public debate and effective democratic oversight.

On November 11, 2016, just three days after the election, Rosenberg submitted a narrow FOIA request seeking emails sent by General Kelly to Lisa Monaco, Assistant to President Obama for Homeland Security and Counterterrorism.  McCubbin Decl. Ex. 1, ECF No. 18-2.[2]  In making this request, Rosenberg noted that General Kelly was being considered for a major role in the Trump administration and that she was seeking the information to inform the public about an ongoing news story of immediate concern.  Accordingly, she requested the expedited processing to which she was statutorily entitled pursuant to 5 U.S.C. § 552(a)(6)(E).

On November 23, 2016, Rosenberg received an email acknowledging receipt of her request but denying expedited processing, stating that "a compelling need is not demonstrated." McCubbin Decl. Ex. 2.  Given the time-sensitive nature of Rosenberg's request, she filed an administrative appeal from the denial of expedited processing the following week.  McCubbin Decl. Ex. 3.  SOUTHCOM never acknowledged or responded to the administrative appeal.  Pls.' SMF ¶ 4.

**B.  General Kelly's Subsequent Nomination and Confirmation as DHS Secretary, and His Later Appointment to White House Chief of Staff**

In December 2016, President-elect Trump nominated General Kelly to be Secretary of Homeland Security.  SMF ¶ 57.  He was confirmed in January 2017.  SMF ¶ 59.  As DHS Secretary, General Kelly played a key role in the development and implementation of President Trump's initial travel ban.  General Kelly told Congress that he had seen multiple drafts of the executive order before it was issued and claimed that the order was "long overdue."  SMF ¶ 60.

---

[2] Rosenberg submitted the request simultaneously (a) by email to Marco T. Villalobos, Command FOIA Manager as SOUTHCOM; (b) via DOD's electronic portal; (c) by letter mailed to SOUTHCOM; and (d) by fax.

General Kelly was also involved in a controversial proposal to require that nationals of seven Muslim-majority countries entering the United States hand over the passwords to their social media accounts to security officials.  SMF ¶ 61.  DHS has since published a more expansive plan to track the social media use of all immigrants, including permanent residents and naturalized citizens.  SMF ¶ 63.

After six months as Secretary of Homeland Security, General Kelly was named President Trump's Chief of Staff, replacing Reince Priebus.  SMF ¶ 62.  This elevation only increases the influence General Kelly has on Administration policy, particularly with respect to national security issues.  Consequently, prompt release of the information sought by Rosenberg's FOIA request remains a matter of great public interest.

### C.  Procedural Posture and DoD's Continuing Refusal to Disclose

On March 30, 2017, plaintiffs filed this lawsuit under 5 U.S.C. § 552, challenging the government's failure to expedite processing of the FOIA request and its failure to disclose the requested documents.  The government filed its answer on April 27, 2017, and counsel then met and negotiated a schedule for the government finally to review, process, and produce records.

In a series of four subsequent productions, the government produced 256 emails sent by General Kelly to Lisa Monaco and 92 attachments to these emails.[3]  These records generally fall into three categories: (1) status reports, including cover emails, (2) substantive follow-up emails, and (3) emails with redacted subject lines and fully or largely redacted bodies.

### 1.    Status reports.

The government identified 120 records providing regular status reports on the operation of the Guantánamo Bay detention camp, titled "Gitmo Update."  Of these, 31 status reports are

---

[3] The entire production is annexed as Exhibit PP to the Langford Declaration.

included within the body of the email (a representative example is Record 3, Bates 1-4), and 89

status reports are email attachments (a representative example is Record 28, Bates 336-39).

Status reports included in the body of an email are all virtually entirely redacted, under claims of

exemption pursuant to 5 U.S.C. § 552(b)(1) (national security), (b)(5) (deliberative process) and

(b)(6) (personal privacy).  The status reports sent as attachments have uniform section headings

for "Behavioral Health Unit," "Camps," "Detainee Move Orders," "Facilities," "Upcoming

Events," and "Final Comments," but again are otherwise substantially redacted:

- The "Behavioral Health Unit/Detainee Hospital" sections range in length from several lines to a full page, and are usually fully redacted, citing national security, *see, e.g.*, Record 281, Bates 336; Record 282, Bates 340; Record 288, Bates 356, and sometimes personal privacy, *see, e.g.*, Record 288, Bates 356.

- The "Camps" sections are several paragraphs long and fully redacted citing national security, *see, e.g.*, Record 289, Bates 360, and sometimes personal privacy, *see, e.g.*, Record 288, Bates 356.

- The "Upcoming Events" sections typically contain between ten and thirty lines, with each line consisting of the name and date of an event.  Disclosed events include hearings, commissions, visits, and holidays.  Most of the events are unredacted, but several in each report are redacted citing national security, *see, e.g.*, Record 290, Bates 363; and personal privacy, *see, e.g.*, Record 289, Bates 360.

- The "Detainee Move Orders" sections discuss pending detainee transfers and often indicate there is nothing to report.  When there are pending transfers, they are often discussed at length, and these discussions are fully redacted citing national security and personal privacy, *see, e.g.*, Record 279, Bates 329.

- The "Facilities" sections range in length from a single sentence to a couple of paragraphs, and describe ongoing and future repairs to various facilities in the camp.  These sections are usually unredacted.

- The "Final Comments" sections contain multiple subsections that vary from report to report.  For example, one frequently recurring subsection is "Female Guard Discrimination," discussing a controversial court order prohibiting the use of female guards in positions that require touching the detainees.  *See, e.g.*, Record 278, Bates 328.  This subsection is usually partially redacted under deliberative process.  *See, e.g.*, Record 278, Bates 328; Record 281, Bates 338.  Another subsection titled "Enteral Feeding (e-feeding)" discusses the controversy surrounding the practice of force-feeding detainees.  *See, e.g.*, Record 281, Bates

338.  This section is usually significantly redacted citing the national security, deliberative process and personal privacy exemptions.  *See, e.g.*, Record 281, Bates 338; Record 336, Bates 509-10.

The government also produced cover or transmittal emails written by General Kelly to accompany the weekly status reports sent as attachments.  *See, e.g.*, Record 14, Bates 12. Additional comments in these cover emails are often redacted, citing national security and personal privacy.

### 2.     Substantive follow-up emails.

The government produced 50 pages of follow-up emails discussing the weekly reports. These range in subject matter across issues in the weekly status reports.  *See, e.g.*, Record 212, Bates 218 (asking if there was "[a]ny response to our request to reconsider female guard issue"); Record 217, Bates 222 (stating that there was "[m]ore to follow" in a discussion on "e-feeding procedures").  Throughout these emails, the government redacts information citing national security and personal privacy.

### 3.     Emails with redacted subject lines.

Finally, the government produced 18 pages of emails with redacted subject headings. *See, e.g.*, Record 4, Bates 5.  All subject-headings that are redacted are redacted under the national security exemption.  The contents of these emails are also heavily redacted citing national security and personal privacy.

### ARGUMENT

The government fails to satisfy its burden to justify its sweeping redactions of the records belatedly produced.  First, and most notable, is the government's failure to specify any particular harm that would accompany the release of information withheld under Exemption 5—something it is obligated to do under the FOIA Improvement Act of 2016.  The government fails to satisfy other requirements for Exemption 5 withholdings as well.  Second, the government fails to meet

its burden under Exemption 1 because it fails to establish that disclosure of the information

sought would reasonably harm national security, particularly in light of the officially

acknowledged public information on the same subjects as the redacted material.  Third, under

Exemption 6, the government fails to demonstrate either that the withheld information presents

any privacy interest or, if it does, that this privacy interest outweighs the public's substantial

interest in the withheld information.  Finally, the government fails to establish that the records it

withheld under Exemption 7(E) would, if released, reveal law enforcement investigative

techniques.  This Court should review the withheld information to assess the government's

overbroad claims and direct the government to disclose its records more fully.

## I.     THE GOVERNMENT'S RECENTLY HEIGHTENED BURDEN TO WITHHOLD INFORMATION AND THE STANDARD OF REVIEW

Under FOIA, agencies bear the burden of justifying withholding information.  5 U.S.C. §

552(a)(4)(B); *see also U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991) ("[T]he strong

presumption in favor of disclosure places the burden on the agency to justify the withholding of

any requested documents.").  As the D.C. Circuit has explained, "the burden is on [the agencies]

to establish their right to withhold information from the public and they must supply the courts

with sufficient information to allow us to make a reasoned determination that they were correct."

*Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 861 (D.C. Cir. 1980).  Accordingly,

agencies "must demonstrate that the information withheld logically falls within a

claimed exemption, and are not controverted by either contrary evidence in the record nor by

evidence of agency bad faith."  *Am. Immigration Lawyers Ass'n v. Exec. Office for Immigration

Review*, 830 F.3d 667, 673 (D.C. Cir. 2016).

Now, in addition to demonstrating that an exemption properly applies, the government

must show that any discretionary withholdings satisfy the "foreseeable harm" standard added to

FOIA in 2016.  Before last year, an agency seeking to withhold information under FOIA had only to demonstrate that the information fell into one of nine statutory exemptions.  *See* 5 U.S.C. § 552(b). Under the 2016 FOIA amendments, however, an agency may withhold information only if it falls within a statutory exemption *and* the agency can "reasonably foresee[] that disclosure would harm an interest protected by an exemption described in subsection (b); or disclosure is prohibited by law."  FOIA Improvement Act of 2016, Pub. L. No. 114-185, § 2, 130 Stat. 538, 539 (codified as amended at 5 U.S.C. § 552(a)(8).

The 2016 amendment imposes this new requirement where a permitted withholding is discretionary, as opposed to mandatory.  Withholding is mandatory—that is, "disclosure is prohibited by law"—when information is covered by Exemptions 1 or 3; covered by Exemption 4 and the specific disclosure is prohibited by the Trade Secrets Act, 18 U.S.C. § 1905; or covered by Exemptions 6 or 7(C) and the specific disclosure is prohibited by the Privacy Act of 1974, 5 U.S.C. § 552a.  *See* Langford Decl. Ex. Q at 2-3 & n.5; U.S. Department of Justice, *Guide to the Freedom of Information Act, 2009 Edition*, at 686-92 (2009).  All other withholding permitted under FOIA is discretionary.  Under the 2016 amendment, when withholding is mandatory an agency need not demonstrate a foreseeable harm; in all other cases an agency must satisfy the foreseeable harm standard.

Congress identified the codification[4] of the "foreseeable harm" standard as the "[m]ost important[]" amendment in the FOIA Improvement Act of 2016.  Langford Decl. Ex. Q at 4.  It is meant to reverse "a growing and troubling trend" among agencies of "relying on . . .

---

[4] The origins of the amendment trace back to a 1993 memo issued by then Attorney General Janet Reno, which stated that "it shall be the policy of the Department of Justice to defend the assertion of a FOIA exemption only in those cases where the agency reasonably foresees that disclosure would be harmful to an interest protected by that exemption."  Pls.' SMF ¶ 26. The policy was reversed in 2001 by then Attorney General John Ashcroft, Pls.' SMF ¶ 28, and then re-instated in 2009 by then Attorney General Eric Holder, Pls.' SMF ¶ 29.

discretionary exemptions to withhold large swaths of Government information, even though no

harm would result from disclosure." *Id.* at 3.  The Senate Report makes clear that the change is

intended to re-calibrate FOIA to tip the balance back towards disclosure:

> The Freedom of Information Act should be administered with a clear presumption: In the face of doubt, openness prevails. The Government should not keep information confidential merely because public officials might be embarrassed by disclosure, because errors and failures might be revealed, or because of speculative or abstract fears.  Nondisclosure should never be based on an effort to protect the personal interests of Government officials at the expense of those they are supposed to serve.

*Id.* at 8 (quoting President Barack Obama, *Memorandum for the Heads of Executive*

*Departments and Agencies, Subject: Freedom of Information Act* (Jan. 21, 2009)).  Under the

foreseeable harm standard, "the content of a particular record should be reviewed and a

determination made as to whether the agency reasonably foresees that disclosing that particular

document, given its age, content, and character, would harm an interest protected by the

applicable exemption."  *Id.*

FOIA directs courts to review agency determinations "de novo," and the court "may

examine the contents of . . . agency records in camera to determine whether such records or any

part thereof shall be withheld under any of the exemptions set forth in subsection (b)."  5 U.S.C.

§ 552(a)(4)(B); *see also Dep't of Air Force v. Rose*, 425 U.S. 352, 379 (1976) ("Congress vested

the courts with the responsibility ultimately to determine 'de novo' any dispute as to whether the

exemption was properly invoked in order to constrain agencies from withholding nonexempt

matters.").

The obligation to conduct a de novo review extends fully to information withheld on

national security grounds.  *See Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007).  Although

courts should give "substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record," review is nonetheless "de novo." *Id.*

## II.    THE GOVERNMENT FAILS TO DEMONSTRATE THAT INFORMATION WAS PROPERLY WITHHELD UNDER EXEMPTION 5

Agencies may invoke Exemption 5 to withhold or redact "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  To qualify for this exemption, a document must thus satisfy two conditions: "its source must be a Government agency, and it must fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it."  *Dep't of Interior v. Klatham Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001).  Here, the government relies on the "deliberative process" privilege to justify all of its Exemption 5 withholdings.  *See* Def.'s Mem. P. & A. in Supp. of Def.'s Mot. for Summ. J. 26 ("Def.'s Mem.").

The "deliberative process" privilege covers "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated."  *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 148 (1975).  Its "ultimate purpose" is to "prevent injury to the quality of agency decisions," *id.* at 151, "by protecting open and frank discussions among those who make them within the Government," *Klatham Water Users Protective Ass'n*, 532 U.S. at 9.

To invoke the deliberative process privilege, an agency must demonstrate that a document is both pre-decisional and deliberative.  *Abtew v. U.S. Dep't of Homeland Sec.*, 808 F.3d 895, 898 (D.C. Cir. 2015). Under the new foreseeable harm standard, an agency must further demonstrate that it reasonably foresees that disclosure of pre-decisional and deliberative material would harm the quality of agency decisionmaking.  *See* 5 U.S.C. § 552(a)(8).  Finally,

even when material may properly be withheld under these standards, Exemption 5 "does not protect purely factual material" appearing therein, and that information must be disclosed. *ITT World Commc'ns, Inc. v. FCC*, 699 F.2d 1219, 1236 (D.C. Cir. 1983) (quoting *EPA v. Mink*, 410 U.S. 73, 91 (1973)).

All of the Exemption 5 withholdings in this case are improper because the government has failed to demonstrate a reasonably foreseeable harm to any interest protected by Exemption 5. The government has further failed to identify the specific deliberative process to which its Exemption 5 withholdings relate, or to disclose all reasonably segregable factual material.

### A. The Government Fails to Demonstrate Reasonably Foreseeable Harm to an Interest Protected by Exemption 5

The government fails to meet its new Exemption 5 burden to make a specific showing of a reasonably foreseeable harm to DoD's deliberative process that would result from the release of specific material. Rather, it appears to have invoked Exemption 5 to withhold embarrassing information and information concerning mundane issues and past decisions, the disclosure of which is unlikely to chill future deliberations.

The government does not specifically address the reasonably foreseeable harm standard for any of its Exemption 5 withholdings. The only mention of potential harm is a blanket incantation of the importance of "full, frank, and open discussions on matters of policy," and the general assertion that disclosure "would have a chilling effect on robust debate among senior officials about JTF-GTMO and jeopardize the free exchange of information." Def.'s Mem. 33. This is plainly insufficient.

The Department of Justice's Office of Information Policy (OIP) has issued guidance specifically addressing the application of the foreseeable harm standard to Exemption 5 and the

11

deliberative process privilege.  *See, e.g.*, Langford Decl. Ex. U (OIP Guidance: Foreseeable

Harm and Exemption 5); Langford Decl. Ex. V (OIP Guidance: Applying the Holder Memo).[5]

In general, the guidance notes that "there is no doubt that records protected by Exemption 5 hold

the greatest promise for increased . . . release" under the standard.  Langford Decl. Ex. V at 5

(OIP Guidance: Applying the Holder Memo).  According to OIP:

> In each case, a FOIA officer should now try to determine whether
> disclosure of the information in question would foreseeably harm
> the basic institutional interests that underlie the deliberative
> process privilege. In other words, he or she must
> consider whether it "would actually inhibit candor in the decision-
> making process" to disclose that *particular* information to the
> public at that *particular* time.

Langford Decl. Ex. U (OIP Guidance: Foreseeable Harm and Exemption 5) (emphases added)

(quoting *Army Times Pub. Co. v. Dep't of Air Force*, 998 F.2d 1067, 1072 (D.C. Cir. 1993)).

To guide agency decision makers in determining whether harm to protected interests is

reasonably foreseeable, OIP identifies a number of factors that should be considered, including

the nature of the decision involved, the nature of the decision-making process, the status of the

decision, the status of the personnel involved, the potential for process impairment, the

significance of any process impairment, the age of the information, and the sensitivity of

individual record portions.  *Id.*  For example, if a decision has already been made, there is "far

less likelihood" of harm from disclosure.  *Id.*  And "with more 'mundane' agency decisions,

Exemption 5 should apply only where disclosure 'genuinely could be thought likely to diminish

---

[5] As noted above, the new foreseeable harm standard codifies a policy adopted by the
Clinton and Obama Administrations. *See supra* p. 12 n.14; *see also* Langford Decl. Ex. Q at 7
(Sen. R. No. 114-4) (explaining that enacting the foreseeable harm standard was meant to
"codif[y] the policy established for releasing Government information under FOIA by President
Obama…"). Thus, in interpreting the Act's foreseeable harm standard, the Court should look to
Attorney General Holder's memorandum, Attorney General Reno's memorandum (on which it
was based), and the guidance issued by the Department of Justice to agencies indicating how the
rule was to be applied.

the candor of agency deliberations in the future.'" *Id.* (quoting *Petroleum Info. Corp. v. U.S. Dep't of the Interior*, 976 F.2d 1429, 1436 (D.C. Cir. 1992)).

Accordingly, to satisfy the new foreseeable harm standard, the government was required, at a minimum, to establish a specific foreseeable harm that would reasonably result from the release of each Exemption 5 withholding. It has not done so. The Exemption 5 withholdings are improper for this reason alone; but they fail to satisfy a number of other Exemption 5 requirements as well.

### 1. No harm to legitimate agency decisionmaking is reasonably foreseeable from disclosure of impermissible animus or personally embarrassing material.

The "ultimate purpose" of the deliberative process privilege is "to prevent injury to the quality of agency decisions." *Sears, Roebuck & Co.*, 421 U.S. at 151. The privilege achieves this end by protecting "creative debate and candid consideration of alternatives within an agency, and, thereby, improv[ing] the quality of agency policy decisions." *Russel v. Dep't of the Air Force*, 682 F.2d 1045, 1048 (D.C. Cir. 1982) (quoting *Jordan v. U.S. Dep't of Justice*, 591 F.2d 753, 773 (D.C. Cir. 1978)). However, candor is not an end in and of itself; rather, it is valuable only to the extent that it serves the ultimate end of "improv[ing] the quality of agency policy decisions." *See id.* Accordingly, "[t]he Government should not keep information confidential merely because public officials might be embarrassed by disclosure, because errors and failures might be revealed, or because of speculative or abstract fears" and "[n]ondisclosure should never be based on an effort to protect the personal interests of Government officials at the expense of those they are supposed to serve." Langford Decl. Ex. Q at 8 (Sen. R. No. 114-4).

For these reasons, courts have long recognized a "government misconduct" exception to the deliberative process privilege. *See In re Sealed Case*, 121 F.3d 729, 738 (D.C. Cir. 1997). "[W]here there is reason to believe the documents sought may shed light on government

misconduct, the [deliberative process] privilege is routinely denied, on the grounds that shielding internal government deliberations in this context does not serve the public's interest in honest, effective government."  *Id.*; *see, e.g.*, *Nat'l Whistleblower Ctr. v. Dep't of Health & Human Servs.*, 903 F. Supp. 2d 59, 67 (D.D.C. 2012) (recognizing the applicability of the misconduct exception to Exemption 5 withholdings in FOIA cases).

Similarly, when deliberations are motivated by impermissible animus, shielding those deliberations not only fails to enhance the quality of agency decisionmaking, but it disserves the public's interest in honest, effective government.  "[I]t is inconceivable that Congress intended to shield . . . information otherwise subject to the deliberative process privilege" when that information bears on impermissible agency discrimination.  *Waters v. U.S. Capitol Police Bd.*, 216 F.R.D. 153, 163 (D.D.C. 2003).  Deliberations driven by impermissible animus include, for example, opinions, recommendations, and advice premised on malice or bias towards a race or a religious or ethnic group or open discrimination.  *See In re Subpoena Duces Tecum Served on Office of Comptroller of Currency,* 145 F.3d 1422, 1424 (D.C. Cir. 1998), *on reh'g in part*, 156 F.3d 1279 (D.C. Cir. 1998) (holding that the deliberative process privilege yields in Title VII actions involving unconstitutional discrimination); *cf. Pena-Rodriguez v. Colorado*, 137 S. Ct. 855 (2017) (recognizing an exception to the no-impeachment rule to jury verdicts where there is evidence of racial animus).  Plans to violate the law also fall outside the deliberative process privilege.  *See In re Subpoena Served Upon Comptroller of Currency, & Sec'y of Bd. of Governors of Fed. Reserve Sys.*, 967 F.2d 630, 634 (D.C. Cir. 1992) (holding the privilege overcome "where necessary to . . . shed light on alleged government malfeasance").

In this case, at least some of the information withheld under Exemption 5 appears to involve facially illegitimate deliberations, including deliberations based on impermissible

animus. For example, Record 72 contains "a short redaction of General Kelly's opinion of certain detainees' behavior." McCubbin Decl. ¶ 43. And in Record 320 General Kelly compares a military commission ruling prohibiting female guards from touching detainees to the *Dred Scott* decision, followed by a lengthy deliberative-process redaction. *See* Bates 454. These and other reactions appear designed to conceal animus or embarrassing comments. However, given the informational asymmetry between the parties, determining which redactions involve facially illegitimate deliberation can only be done through an *in camera* review of the redacted material.

**2.  No harm to legitimate agency decisionmaking is reasonably foreseeable from disclosure of discussions having no impact on agency policy.**

One factor agencies must consider in determining whether the released of records covered by Exemption 5 would foreseeably result in harm is the nature of the decision. Langford Decl. Ex. U (OIP Guidance: Foreseeable Harm and Exemption 5). "Some agency decisions are highly sensitive and perhaps even controversial; most of them are far less so." Langford Decl. Ex. U (OIP Guidance: Foreseeable Harm and Exemption 5). Exemption 5 should apply to "mundane" agency decisions only where disclosure "genuinely could be thought likely to diminish the candor of agency deliberations in the future." Langford Decl. Ex. U (OIP Guidance: Foreseeable Harm and Exemption 5) (quoting *Petroleum Info. Corp. v. U.S. Dep't of the Interior*, 976 F.2d 1429, 1436 & n.8 (D.C. Cir. 1992)).

Many of the decisions for which the government invokes the deliberative process privilege appear to be sufficiently minor and uncontroversial that their release would not chill the candor of the government's decisionmaking process. For example, Records 140 and 143 contain General Kelly's opinions about housing and recreational opportunities at the prison, McCubbin Decl. ¶ 45; Record 22 contains "a short redaction of General Kelly's opinion on the usefulness of certain advisory documents provided to senior officials," McCubbin Decl. ¶ 61; Record 85

contains "a deliberative discussion of a response to a congressional letter," McCubbin Decl. ¶ 61; Record 295 contains a discussion related to holiday black-outs, *see* Bates 383; Records 31, 64, 65, 105, 195, 255, 319, and 324 contain discussions related to the effects of visits to Guantánamo on operations, McCubbin Decl. ¶ 57; and Records 129, 131, 140, 211, 226, 290, 295, and 327 contain deliberative discussions related to facility management.  Disclosure of these mundane, low-level deliberations is unlikely to produce the kind of controversy that would cripple the decisionmaking process and inhibit frank and open discussion.

### 3. No harm to legitimate agency decisionmaking is reasonably foreseeable from disclosure of discussions concerning past decisions.

With decisions that have "not yet [been] made, . . . there is a far greater likelihood of harm from disclosure; conversely, with decisions already made there is far less likelihood." Langford Decl. Ex. U (OIP Guidance: Foreseeable Harm and Exemption 5).  Among the rationales for the deliberative process privilege is that it "protects the public from the confusion that would result from premature exposure to discussions occurring before the policies affecting it had actually been settled upon." *Russell*, 682 F.2d at 1048 (quoting *Jordan*, 591 F.2d at 772-73).  This confusion can have the further effect of inhibiting continuing deliberations as agencies turn their focus to managing public perception rather than the substance of the issue at hand.  Once a decision has been made, this rationale no longer applies, weakening the case that disclosure will foreseeably harm the quality of decision making.

Many of the deliberations referenced in the government's declaration relate to decisions that have already been made.  For example, Record 85 discusses a response to a congressional letter.  McCubbin Decl. ¶ 61.  In all likelihood, the Government has already responded to the letter.  Likewise, many if not all of the personnel matters discussed in Records 270, 272, 281, 287, 295, 299, 311, 312, 319, and 333 have likely already been resolved.  *See* McCubbin Decl. ¶

16

53.  Record 270 includes a redacted discussion that appears to pertain to an officer leaving SOUTHCOM entirely for another position, as do Records 311, 312, and 319; it is difficult to imagine that these discussions pertain to any active deliberative process.  Similarly, the female guard discrimination controversy was resolved on May 27, 2016, when the order barring female guards from touching certain male detainees was lifted.  Pls.' SMF ¶ 52.

Given that these deliberations concern decisions that have already been made, there is little likelihood that disclosure would harm the quality of the agency's decisionmaking going forward.  These deliberations should therefore be released.

### B.  The Government Fails To Disclose All Reasonably Segregable Factual Material

As noted above, Exemption 5 "does not protect 'purely factual material appearing in . . . documents in a form that is severable without compromising the private remainder of the documents.'"  *ITT World Commc'ns, Inc.*, 699 F.2d at 1236 (quoting *Mink*, 410 U.S. at 91); *see also Coastal States Gas Corp.*, 617 F.2d at 867 (the deliberative process privilege "applies only to the 'opinion' or 'recommendatory' portion of the report, not to factual information" (citation omitted)).  Beyond its failure to demonstrate reasonably foreseeable harm, the government has failed to disclose all reasonably segregable factual material.  *See* 5 U.S.C. § 552(a)(8)(A)(ii)(II) ("An agency shall . . . take reasonable steps necessary to segregate and release nonexempt information").

In many instances, the government claims that fact and opinion, recommendations, or advice are interwoven.  For example, it asserts that factual material is hopelessly interwoven with deliberative material in Records 149, 232, and 258.  *See* McCubbin Decl. ¶¶ 45-46, 60.  But to the extent that these records are nearly entirely redacted, the government has likely failed to meet its burden to take reasonable steps necessary to segregate and release nonexempt information.

*See Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977) ("[A]n agency cannot justify withholding an entire document simply by showing that it contains some exempt material."). Without *in camera* review, there is no independent confirmation that the government has fulfilled its responsibility to release all reasonably segregable factual material.

Other records also seem likely to contain segregable factual material. For example, Records 270, 272, 281, 287, 295, 299, 311, 312, 319, and 333 contain discussions "about the performance of selected personnel." McCubbin Decl. ¶ 53. These discussions almost certainly include factual material that can be segregated from General Kelly's opinions and advice, particularly considering that the government's redactions in these and other records often span multiple paragraphs in their entirety. *See, e.g.*, Bates 159-60, 230-32, 414-15, 422-23, 429, 443-44, 454-55, 458-59, 477-78 and 501-02.

Because an assessment of whether factual material is segregable requires a review of the unredacted documents, plaintiffs again respectfully request *in camera* review of the Exemption 5 redactions.[6]

### C. The Government Fails To Identify the Pre-Decisional Deliberative Process to Which Withheld Information Relates

As noted above, in order to withhold documents under the deliberative process privilege and Exemption 5, an agency must demonstrate that they are both pre-decisional and deliberative. *Abtew*, 808 F.3d at 898. To do so, an agency "has the burden of establishing what deliberative process is involved, and the role played by the documents in issue in the course of that process." *Coastal States Gas Corp.*, 617 F.2d at 868. To uphold an Exemption 5 withholding, "a court must be able 'to pinpoint an agency decision or policy to which the document

---

[6] While many records contain some Exemption 5 redactions, these exemptions, in the aggregate, constitute a relatively small portion of the 548-page production.

contributed.'" *Senate of the Com. of P. R. on Behalf of Judiciary Comm. v. U.S. Dep't of Justice*, 823 F.2d 574, 585 (D.C. Cir. 1987) (quoting *Paisley v. CIA*, 712 F.2d 686, 698 (D.C. Cir.1981)); *see also Judicial Watch, Inc. v. U.S. Postal Service*, 297 F. Supp. 2d 252, 264 (D.D.C. 2004) (requiring an agency to identify particular decisionmaking processes so that the court can determine if documents are predecisional).

The District Court described this burden in *National Security Counselors v. CIA*:

> At a minimum, the agency must provide three basic pieces of information in order for the deliberative-process privilege to apply: (1) the nature of the *specific* deliberative process involved, (2) the function and significance of the document in that process, and (3) the nature of the decisionmaking authority vested in the document's author and recipient.

*Nat'l Sec. Counselors v. CIA*, 960 F. Supp. 2d 101, 189 (D.D.C. 2013) (emphasis added).

Here, the government has failed to identify the specific, predecisional deliberative process to which many of its Exemption 5 withholdings relate. For example, in Records 140, 143, 248, 250, and 253, "General Kelly advises senior officials about planned actions or policy changes responding to detainee conduct." McCubbin Decl. ¶ 43. The description, however, indicates that those communications were not part of a *pre*decisional deliberation—the actions and policy changes were already planned at the time of the communication.[7]

Record 72, in turn, contains "a short redaction of General Kelly's opinion of certain detainees' behavior." McCubbin Decl. ¶ 43. The Government claims that this communication is part of "the consultative process in managing operations." McCubbin Decl. ¶ 43. But by such a general standard, almost any communication between General Kelly and the administration

---

[7] Notably, Exemption 5 does not even cover records that "simply state or explain a decision the government has already made." *In re Sealed Case*, 121 F.3d 729, 737; *see ITT World Commc'ns, Inc.*, 699 F.2d at 1236 (the deliberative process privilege does not cover "material that merely sets forth official agency views and practices with respect to the interpretation and implementation of existing policies").

would fall under the deliberative process privilege, and the basic purpose of FOIA—"to ensure an informed citizenry, vital to the functioning of a democratic society," *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978)—would be entirely thwarted.  Such an interpretation of Exemption 5 would run counter to Congress's desire "to delimit [Exemption 5] as narrowly as consistent with efficient Government operation," *Mink*, 410 U.S. at 88-89 (quoting S. Rep. No. 89-813, at 9 (1965)).

Likewise, in Records 262, 263, 268, 271, 272, 275, 277, 278, 279, 280, 281, 283, 286, 291, 294, 295, 297, 301, 303, 305, 310, 311, 313, 318, 319, 320, 321, 335, and 346, General Kelly provides his opinions about a military commission ruling barring female guards from touching certain detainees and the consequences of the ruling.  McCubbin Decl. ¶ 54.  To the extent that General Kelly is opining about the merits of a judicial ruling, this material is not properly characterized as part of a pre-decisional deliberative process.  *See, e.g.*, Bates 454.  Additionally, in Record 290, a short phrase is redacted in the context of a discussion regarding a visit by the Federal Bureau of Prisons.  *See* Bates 364.  It is not clear from context, nor from the McCubbin Declaration, what deliberative process this phrase relates to.

Finally, the government does not even mention several records where it made redactions under the deliberative process privilege in the Exemption 5 section of Brigadier General McCubbin's Declaration, including Records 189, 201, and 251.  The government bears the burden of articulating the particular deliberative process justifying each redaction under Exemption 5.  Production material that is not related to a particular deliberative process cannot be withheld and must be released.

**III.    THE GOVERNMENT FAILS TO DEMONSTRATE THAT
         INFORMATION WAS PROPERLY WITHHELD UNDER EXEMPTION 1**

Plaintiffs also challenge the scope of the government's Exemption 1 redactions because the government has failed to demonstrate that disclosure would reasonably harm national security, and hence failed to demonstrate that the withheld information is properly classified.

Agencies may invoke Exemption 1 to withhold or redact records only when the records are "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy" and are "in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1).  To withhold classified information, the government must satisfy two substantive criteria set forth in Executive Order 13,526.  *See Lesar v. U.S. Dep't of Justice*, 636 F.2d 472, 483 (D.C. Cir. 1980).  First, "classified information must pertain to at least one of eight subject-matter classification categories." *Judicial Watch, Inc. v. U.S. Dep't of Def.*, 715 F.3d 937, 941 (D.C. Cir. 2013).  Second, the government must show that disclosure of such information is reasonably expected to cause "harm to the national defense or foreign relations of the United States . . . taking into consideration such aspects of the information as the sensitivity, value, utility, and provenance of that information."  Exec. Order No. 13,526, § 6.1(l), 75 Fed. Reg. 707, 727 (Dec. 29, 2009).  This harm to national security must be "identifiable," "describable," and "plausible."  *Judicial Watch*, 715 F.3d at 941.

To show that the requirements of Exemption 1 have been met, the government may rely upon affidavits, but those affidavits must "provide detailed and specific information" sufficient to demonstrate that disclosure of such information would reasonably be expected to harm the relevant national security interest. *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 30 (D.C. Cir. 1998) *as amended* (Mar. 3, 1999).  Simply providing a "categorical description" of redacted material or "categorical indication of anticipated consequences of disclosure" is "clearly

21

inadequate." *Id.*  Additionally, "conclusory affidavits that merely recite statutory standards, or are overly vague or sweeping will not . . . carry the government's burden." *Larson v. Dep't of State*, 565 F.3d 857, 864 (D.C. Cir. 2009).

An agency affidavit is accorded some weight on matters of national security only if it "describes the justifications for withholding the information with specific detail, demonstrates that the information withheld logically falls within the claimed exemption, and is not contradicted by contrary evidence in the record or by evidence of the agency's bad faith." *ACLU v. U.S. Dep't of Def.*, 628 F.3d 612, 619 (D.C. Cir. 2011).  Given the "asymmetrical distribution of knowledge" in FOIA cases, *King v. U.S. Dep't of Justice*, 830 F.2d 210, 218 (D.C. Cir. 1987), the government has an obligation to create "as full a public record as possible, concerning the nature of the documents and the justification for nondisclosure." *Hayden v. Nat'l Sec. Agency*, 608 F.2d 1381, 1384 (D.C. Cir. 1979).

The government fails to meet these burdens in a variety of ways.  As a threshold matter, there are two concerns that recur throughout its Exemption 1 redactions:

*First*, the government cannot properly withhold information under Exemption 1 simply because its disclosure would be embarrassing to government officials.  Under Executive Order 13,526, information cannot "be classified" or "continue to be maintained as classified" to "prevent embarrassment to a person, organization, or agency."  Exec. Order 13,526 § 1.7(a)(2). Nonetheless, a number of the Exemption 1 redactions plainly aim to shield officials from the release of embarrassing information, such as their opinions about a gender discrimination lawsuit.  *See, e.g.*, Record 265 ("Final Comments" containing two fully redacted paragraphs followed by "[w]e may experience repercussions from media and defense teams"); Record 320, at Bates 454 (comparing a judge's ruling on the gender discrimination complaint to the "Dred

22

Scott decision," with following paragraphs fully redacted).  These redactions do not seek to conceal operational information whose release might endanger national security, but rather to conceal comments that may embarrass government officials if made public.

*Second*, the government cannot properly withhold information that it has officially acknowledged in prior disclosures.  Where the government has officially acknowledged information, "a FOIA plaintiff may compel disclosure . . . even over an agency's otherwise valid exemption claim*." ACLU v. U.S. Dep't of Def.*, 628 F.3d 612, 620 (D.C. Cir. 2011).  To be officially acknowledged "(1) the information requested must be as specific as the information previously released; (2) the information requested must match the information previously disclosed; and (3) the information requested must already have been made public through an official and documented disclosure." *Id.* at 620-21.  As described in more detail below, the government has improperly withheld information that has been previously disclosed and officially acknowledged.

### A.  The Government Fails to Justify Withholding Information Characterized as Military Plans, Weapons, or Operations.

The bulk of the government's Exemption 1 claims invoke Section 1.4(a) of Executive Order 13,526, which permits withholding information pertaining to military plans, weapons, or operations.  *See* McCubbin Decl. ¶ 18.  The government argues that "[b]ecause Naval Station Guantanamo Bay is a military installation . . . these details of detention operations are inherently 'military operation[s].'"  Def.'s Mem. 12.  As the government recognized, however, this alone is not sufficient to withhold information.  The government must also demonstrate with "reasonably specific detail" that the disclosure of detention details would cause "serious harm." *Id.*  This burden has not been met.

*Detainee Conduct.*  The government identifies a series of records that include General Kelly's descriptions of detainee conduct, including discussions "identif[ying] noncompliant detainees" and the "relationships between compliant and noncompliant detainees."  *See* McCubbin Decl. ¶ 20.   For these records, the government argues that disclosure would harm national security by "complicating detainee operations," giving "persons that may later be detained" knowledge of "what behavior would be tolerated" or "what behavior caused the United States the most concern."  *Id*.  According to the government, disclosure of the government's "concern" would allow future detainees to shape their behavior to be "maximally disruptive."  *Id.* Alternatively, the government claims that disclosure would inform "current detainees" of "[its] thought processes" which would "make administration of JTF-GTMO significantly more difficult and place military personnel at unnecessary risk."  *Id*.

These conclusory claims are insufficient for two reasons.  First, the government's claims relate almost exclusively to thoughts or impressions and not to actual military procedures, plans, or protocols.  Information that would disclose "the thinking of high-level DoD officials," Def.'s Mem. 15, does not disclose actual operational techniques or procedures.  The disclosure of the thoughts and reactions of government officials might cause embarrassment, but that is no ground for withholding information under Exemption 1.  *See* Exec. Order 13,526 § 1.7(a)(2).

Second, the alleged harms are conclusory and vague.  Statements that disclosure would allow detainees to "complicate" detention or be "disruptive" are the sort of "overly vague" or "sweeping" statements that courts have routinely found insufficient to justify Exemption 1 withholdings.  *Larson*, 565 F.3d at 864; *see also Judicial Watch*, 715 F.3d at 941 (agency required to present harms "identifiable" or "describable").  By its own terms, the government's statement is too vague to provide this Court with any sense of what actual conduct or

consequences result from behavior that is "disruptive."  Further, the government's decision to hide descriptions of "noncompliant" behavior is impermissibly sweeping, since noncompliance includes large categories of conduct that would be harmless to disclose.  For example, noncompliance could include something as simple as a detainee's refusal to eat food—behavior that is public knowledge and whose disclosure would not in any way place military personnel at unnecessary risk.  *See* Pls.' SMF ¶ 44.

Further, the government fails to reasonably segregate non-exempt information from that withheld under the category of detainee conduct.  Under FOIA, any "reasonably segregable" information must be disclosed.  5 U.S.C. § 552(b).  Yet records that discuss detainee conduct contain pages that are almost entirely redacted.  *See, e.g.*, Records 131, 132, 134, 136, 139.  Even under the government's broad description of the documents' content, there are clear categories of information that could be separable and segregable.  These records likely contain factual information, descriptions of actual protocol or policy actions, and the government's reactions or impressions.  While exempt information may in some instances be "inextricably intertwined" with non-exempt information, the fact that whole pages are redacted without any attempt at segregation means that the government has failed to meet the standard set by FOIA.  *See Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977) ("[A]n agency cannot justify withholding an entire document simply by showing that it contains some exempt material.").

***Detainee Health and Hunger Strikes.***  The government identifies a series of records relating to detainee health and hunger strikes.  *See* McCubbin Decl. ¶¶ 23-26.  These records "discuss in broad and specific terms detainees' mental, physical, and emotional health, as well as the measures . . . being developed or taken to ensure their wellbeing," *id.* ¶ 23, and "the number

of hunger strikers" and "the impact . . . the strike is having on detainees' health." *Id.* ¶ 26. For these records, the government claims that disclosure would allow detainees to "malinger conditions that they perceive from these documents to . . . cause the greatest disruption," "yield[] information that can be used as propaganda by terrorist organizations and other adversaries," or reveal "whether hunger strikes are effective in disrupting the United States' mission, and . . . how they could be best utilized." *Id.* ¶¶ 24, 26. These claims are insufficient to justify the government's withholding of these records under Exemption 1.

First, much of the withheld detainee health information is factual material similar to information that has previously been disclosed, and there is no indication that the release of the withheld information would reasonably harm national security. The government admits that these records concern specific facts about detainees' health, such as "the detainee's weight." McCubbin Decl. ¶ 25. Courts have previously ordered disclosure of Guantánamo detainees' height and weight information. *See Associated Press v. U.S. Dep't of Def.*, 462 F. Supp. 2d 573, 577–78 (S.D.N.Y. 2006) ("*AP III*"). Despite this prior disclosure, the government has not pointed to any indication that the claimed harms to national security have ensued. Thus, at minimum, the government is obligated to disclose similar factual information from these records.

Moreover, while specific protocols for the government's force-feeding program may still be secret, the details of their effects have been disclosed and officially acknowledged. Force-feeding information has been disclosed both in generalized numbers and in specific descriptions. In terms of general information, the government has already disclosed daily figures regarding the number of hunger strikes and instances of force-feeding conducted at Guantánamo. *See* Pls.' SMF ¶ 41. Not only did the government acknowledge these figures, Navy Rear Admiral Kyle Cozad conceded that such information was not classified, and that such numbers

26

"weren't really operationally or medically relevant."  *See* Pls.' SMF ¶ 39.  As a result, the government's attempt to hide records where "General Kelly identifies the number of hunger strikers, highlighting whether there is an increase or decrease in numbers," McCubbin Decl. ¶ 26, is improper.  Such figures have already been disclosed and officially acknowledged, and are subject to disclosure here.  *See ACLU v. U.S. Dep't of Def.*, 628 F.3d 612, 620 (D.C. Cir. 2011).

Also, individual descriptions of the specific implementation and effects of force-feeding have been disclosed and officially acknowledged.  Khalid Qasim and Ahmed Rabbani have described being "force-fed twice a day by being strapped into a restraint chair and having a supplement poured through their noses via a very thin tube."  Pls.' SMF ¶ 44.  And these specific details, both of implementation and effect, have long been officially acknowledged.  In 2006, General Bantz J. Craddock, then head of SOUTHCOM, acknowledged the use of "restraint chairs" to conduct force-feeding operations.  *See* Pls.' SMF ¶ 34.   Accordingly, the government cannot withhold such information.

Even if this Court finds that the information previously disclosed is not sufficiently specific to meet the requirements of official acknowledgment, the disclosure of *similar* information undermines the government's claim that disclosure here would cause serious damage to national security.  In *American Civil Liberties Union v. Department of Defense*, Judge Hellerstein considered a similar deficiency in the government's justifications for withholding photographs of detainees at Abu Ghraib.  229 F. Supp. 3d 193, 210 (S.D.N.Y. 2017) ("*ACLU IV*"). Given that "many photographs have been publicly disseminated, albeit not under Government sponsorship," Judge Hellerstein concluded that the government was required to "compare those photographs with those covered by the Carter certification, and consider whether there have been previous episodes of violence caused by the released photographs."  *Id.*

27

Notwithstanding the deference owed in matters of national security, the court held that the government's failure to do so meant it had failed to sufficiently "articulate the reasons supporting its conclusion that release of the photographs would endanger Americans deployed abroad." *Id.* Likewise, the government here has failed to assert that disclosure would plausibly result in harm to national security since similar information has been publicly disseminated without any sign of the government's asserted harms.

Finally, the government cannot justify withholding of hunger strike and health information to avoid embarrassment over its force-feeding practices or how the health records of detainees reflect upon the government's quality of care. *See* Exec. Order 13,526 § 1.7(a)(2). Given that similar information has been disclosed, and given the absence of the national security harms that the government claims would follow from disclosure, the government cannot hide these documents to avoid giving the public the ability "to assess, not only DOD's conduct with respect to the hunger strikes at Guantánamo, but more generally DOD's care and (literally) feeding of the detainees." *AP III*, 462 F. Supp. at 577. Thus, any government embarrassment over its care of detainees is not a proper ground for withholding such information, and information about the health, status, and hunger strikes of detainees should be disclosed.

***Detainee Movements.*** The government identifies a series of documents containing information about detainee movements to other countries, including "whether a detainee movement is authorized and . . . the logistical requirements necessary . . . and the required approval and coordination with the receiving nation." McCubbin Decl. ¶ 27. The government also admits that "[i]n many of these records, General Kelly discusses the reactions of the detainees upon learning of their transfer." *Id.* For these records, the government claims that disclosure would "create significant national security risks by publicizing sensitive operational

details . . . including the logistical details that could enable interference in future or similar operations," and that disclosure would have a "significant detrimental effect" on the government's ability to "continue cooperating with foreign governments in these operations." *Id.* ¶ 28.

As an initial matter, the government fails to explain how disclosing "the reactions of the detainees upon learning of their transfer," McCubbin Decl. ¶ 27, implicates the national security harms identified.  The reactions or thoughts of detainees do not implicate governmental operations, logistics, procedures, or the United States' relationship with foreign governments. Thus, the government's declaration "fails to draw any connection between the [information] at issue and the general standards that govern the national security exemption," *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 31 (D.C. Cir. 1998) *as amended* (Mar. 3, 1999), and this particular information should be disclosed.

Moreover, the government fails to justify the withholding of information regarding the name and country of destination for detainee transfers, since the government has officially disclosed and acknowledged such information previously.  In fact, DOD has officially announced this information as recently as the start of this year.  *See* Pls.' SMF ¶¶ 48-49.  These announcements go back at least as far as 2005.  *See* Pls.' SMF ¶ 45.  Because of these official acknowledgments, the government has no basis for withholding this information in its records related to detainee movements.

***Female Guard Discrimination.***  Another set of records requested contain information regarding a female guard discrimination complaint and commission proceeding.  The government cursorily references these documents in its "Other" category.  *See* Def.'s Mem. 21. For these documents, the government says it redacted information "describing guard force

composition, guard actions related to detainees, and the use of classified information in related proceedings." McCubbin Decl. ¶ 33. The government does not identify the harm caused by disclosure of this specific information. Instead, the government categorically applies the same justification for withholding this information as it also does for records containing "discussions of detainee-related proceedings in federal court and military commissions," records with "logistical and operational issues related to the detainees and the facilities," records with "operational responses to proceedings and orders that touch on classified subject matter," and records reflecting "discussions of congressional matters related to JTF-GTMO operations." *Id.* ¶ 33. Lumped together, the government claims that disclosure of any of these records would provide those hostile to the United States with "critical information regarding our operations, our policies–and how they change dependent on certain factors–and our vulnerabilities." *Id.* ¶ 34.

Here, the government's broad assertion of harm is plainly insufficient to justify withholding. As courts have made clear, the "categorical indication of anticipated consequences of disclosure" is "clearly inadequate" to justify withholding information under FOIA. *Campbell*, 164 F.3d at 30. Accordingly, the government may not withhold information about female guard discrimination by categorically claiming that it would reveal "critical information regarding our operations . . . policies . . . and our vulnerabilities" and "how they change dependent on certain factors." McCubbin Decl. ¶ 34. These are "conclusory" claims that "will not . . . carry the government's burden." *Larson*, 565 F.3d at 864.

Nor can the government justify withholding records discussing the female guard discrimination issue on the basis that it would disclose detainee removal protocols. The protocols are public knowledge and the government does not plausibly establish that disclosure here would harm national security. Additionally, detainees are well aware of what guards do when removing

detainees from cells; detainees experience it firsthand and have publicly disclosed those experiences. *See* Pls.' SMF ¶ 36. And Forced Cell Extraction (FCE) procedures have already been publicly disclosed without the consequent harms that the government claims will take place. *See* Pls.' SMF ¶¶ 42-43.

Further, any national security concern that disclosure of cell extraction information would lead to counter-tactics does not justify withholding information about ancillary activities, such as internal procedures regarding pre- and post-extraction activities. *See Int'l Counsel Bureau v. U.S. Dep't of Def.*, 723 F. Supp. 2d 54, 63–64 (D.D.C. 2010) (holding that "the preparation of the FCE team members" and "the medical examination of any member of the FCE team who may be injured during the FCE" could not be withheld on the grounds that disclosure would allow detainees to develop "counter-tactics"). The redactions of discussions of female guard discrimination extend far beyond limited descriptions in which female soldiers might participate in cell-extraction, and likely sweeps in ancillary activities beyond that procedure. *See, e.g.*, Record 262 (fully redacting paragraph under "Guard Force Discrimination" heading). Thus, in records containing this subject, the government has likely withheld more information than justified under Exemption 1.

### B. The Government Fails to Justify Withholding Information Characterized as Foreign Government Information

The government has withheld one document, Record 273, under Exemption 1 pursuant to Section 1.4(b) of Executive Order 13,526. According to the government, the "record discusses a detainee movement operation that was postponed." McCubbin Decl. ¶ 35. The government claims that releasing the document would "negatively impact [the government's] ability to deal with foreign nations on sensitive matters," as they would "no longer trust [the government] to

31

deal with confidential and sensitive information." *Id.*  This development, the government

continues, "would impact [its] ability to protect and advance U.S. national interests." *Id.*

The government has not established that Record 273 can be classified under Section

1.4(b) of Executive Order 13,526.  This section of the order provides for the classification of

material the release of which would harm national security and that pertains to "foreign

government information."  Exec. Order No. 13,526, § 1.4(b).  The Order defines "foreign

government information," as relevant here, as "information provided to the United States

Government by a foreign government . . . with the expectation that the information, the source of

the information, or both, are to be held in confidence," or, conversely, "information produced by

the United States Government pursuant to or as a result of a joint arrangement with a foreign

government . . . requiring that the information . . . be held in confidence." *Id.* at § 6.1(s).

The government fails to show either that the redacted information in Record 273 was

provided to the U.S. government with the expectation that it be held in confidence or that the

information was produced by the U.S. government as part of an agreement "requiring" the

information to be held in confidence.  The government merely claims that the record "discusses a

detainee movement operation that was postponed."  McCubbin Decl. ¶ 35.  In providing no detail

on the source of the information or the circumstances, the government's declaration diverges

from those in cases in which this court has found records to fall under the aegis of Section 1.4(b).

*See, e.g.*, *Darui v. U.S. Dep't of State*, 798 F. Supp. 2d 32, 40 (D.D.C. 2011) (finding that

Section 1.4(b) applied to information that the government described in a declaration as "obtained

in confidence from a foreign government"); *Unrow Human Rights Impact Litig. Clinic v. U.S.*

*Dep't of State*, 134 F. Supp. 3d 263, 272-73 (D.D.C. 2015) (finding that Section 1.4(b) applied to

information that the government described in a declaration as "a report of a conversation with senior officials of the British government").

For these reasons, the government has failed to establish that Record 273 can be classified under Executive Order 13,526, and so cannot withhold the record under Exemption 1 of FOIA.

### C. The Government Fails to Justify Withholding Information Characterized as Intelligence Sources and Methods

The government has also redacted 12 records under Section 1.4(c) of Executive Order 13,526, which provides that information can be classified if it pertains to "intelligence activities" or "intelligence sources or methods." Exec. Order No. 13,526, § 1.4(c). The redacted records "include information on intelligence activities that are vital to [the government's] detention operations." McCubbin Decl. ¶ 36. The government claims that the release of these records "could be reasonably expected to reveal intelligence sources and methods or otherwise compromise" the government's intelligence collection mission. *Id.* The government has failed to justify its withholdings both by failing to establish that the redacted records fall under Section 1.4(c)'s protection and by failing to establish the requisite risk of harm to national security that would accompany the records' release.

As an initial matter, the government has failed to show that the records redacted under Section 1.4(c) are actually covered by that section. Records 60 and 186, for example, involve General Kelly discussing the impact the potential declassification of information would have on "detention operations." McCubbin Decl. ¶ 36. The government fails to make clear what, if anything, these detention operations have to do with intelligence operations. The government similarly fails to make clear how Record 168's information about "specific detainee conduct" and "the impetus behind noncompliant activity," *id.*, in any way pertain to intelligence

operations.  And even though this court has recently held that, "[b]y definition, 'intelligence' requires a foreign component," *Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Justice*, 160 F. Supp. 3d 226, 234 (D.D.C. 2016), the government does not make clear how Guantánamo detention operations relates to foreign intelligence activities, sources or methods. Consequently, the government has not established that the information in these records is properly redacted under Section 1.4(c).

Relatedly, the government has not shown that release of the information redacted under this section would harm national security.  As explained above, information can only be classified pursuant to Executive Order 13,526 and thus be eligible for redaction under FOIA's Exemption 1 if its release "reasonably could be expected to cause serious damage to the national security."  Exec. Order No. 13,526, § 1.2(a)(2).  But Record 168, as the government explains, describes the "communal and single-cell distribution" of the prison facility, along with "the impetus behind . . . noncompliant activity."  McCubbin Decl. ¶ 36.  The government says nothing about how General Kelly's musings on why certain detainees may be noncompliant could reasonably be expected to cause serious damage to the national security.  The government also fails to explain how General Kelly's questions about the classification status of already-published information in Records 60 and 186 could cause serious damage to the national security.  Without providing such an explanation, the government cannot rely on Section 1.4(c) to invoke Exemption 1.

IV.     **THE GOVERNMENT FAILS TO DEMONSTRATE THAT INFORMATION WAS PROPERLY WITHHELD UNDER EXEMPTION 6**

The government has redacted information from dozens of emails under Exemption 6. The redactions fall into two main categories.  The first involves government personnel, and includes redactions of the identities of individuals below the rank of colonel or GS-15, the email

addresses of DoD personnel, and "personally identifying information in the form of companies deployed to JTF-GTMO, personal characteristics of military personnel, and some descriptive information about personnel actions." McCubbin Decl. ¶¶ 64, 69 & 67. Plaintiffs do not challenge the first two components of this category. The government justifies the third type of redaction by claiming in conclusory terms that "there is a privacy interest in this information that far outweighs any minimal interest the public could have in the information." *Id.* at ¶ 67.

The second category of Exemption 6 redactions involves detainee information. Specifically, the government withheld "detainee names, numbers, and other identifying information in the context of discussing noncompliant behavior, medical care, detainee movements, and detainee communications." *Id.* at ¶ 70. The government claims that "release of this information would constitute a clearly unwarranted invasion of personal privacy." *Id.* at ¶ 71.[8]

These Exemption 6 withholdings are improper as the government has failed to establish that there are valid privacy interests in the redacted information or that any existing privacy interests are not outweighed by the substantial public interest in this information.

Exemption 6 exempts from FOIA's disclosure requirements "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Deciding if a record's disclosure constitutes a "clearly unwarranted invasion of personal privacy" involves a two-step process. First, a court decides whether "disclosure would compromise a substantial, as opposed to a *de minimis*, privacy interest." *Am. Immigration Lawyers Ass'n v. Exec. Office for Immigration Review*, 830 F.3d

---

[8] The government also withheld certain information regarding two court experts and several visitors to Guantánamo, claiming the "public interest in disclosure of these identities is minimal as it would not serve to illuminate the activities of the government." McCubbin Decl. at ¶ 72.

667, 674 (D.C. Cir. 2016) (quoting *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 33

(D.C. Cir. 2002)).  As the Supreme Court has explained, "Exemption 6 was directed at threats to

privacy interests more palpable than mere possibilities."  *Dep't of Air Force v. Rose*, 425 U.S.

352, 380 n.19 (1976).  Second, a court must weigh "the privacy interest at stake 'against the

public interest in the release of the records.'"  *Am. Immigration Lawyers Ass'n*, 830 F.3d at 673

(quoting *Nat'l Ass'n of Home Builders*, 309 F.3d at 33).  Viewed through this lens, the

government's Exemption 6 redactions do not withstand scrutiny.

### A.   The Government Establishes No Meaningful Privacy Interest in the Redacted Information

The government has entirely failed to establish that there is a privacy interest in much of

this information.  As an initial matter, the government fails to explain how descriptions of

personnel actions would necessarily identify specific personnel and thereby give rise to any

privacy interest.  Similarly, the government does not explain how information regarding

detainees' noncompliant behavior could in any way identify individual detainees.  Without

providing further information, the government has not substantiated its claim that the redacted

information touches on any privacy interest.  At a minimum, the government should be able to

redact any identifying information, such as names, and release anonymized descriptive

information.  5 U.S.C. § 552(b) ("Any reasonably segregable portion of a record shall be

provided . . . after deletion of portions which are exempt under this subsection.").

In any event, the government is redacting information similar in form to information that

it has already released.  "Once information has been disclosed pursuant to the authority of a high

government official, there is no basis to argue that a privacy interest continues to exist."

*Kimberlin v. Dep't of Justice*, 921 F. Supp. 833, 836 (D.D.C. 1996) (citing *Nation Magazine v.

U.S. Customs Serv.*, 71 F.3d 885 (D.C. Cir. 1995)).  Here, the government has released detainee

numbers several times across this production. *See, e.g.*, Record 325, at Bates 473 ("18 February – 768 Sentencing (originally scheduled for 16 January)**."); Record 343, at Bates 536 ("PRB Hearing for detainee 128."). Accordingly, it cannot continue to withhold detainee numbers.

Further, the government has redacted information regarding detainee "medical care" and "detainee medical information." McCubbin Decl. ¶ 70. However, the government has previously released medical charts tracking hunger-striking detainees' weight. *See, e.g.*, Pls.' SMF ¶ 40. These charts, while containing detailed medical information, have been anonymized and so pose no risk to detainees' privacy. The government gives no justification for why the medical information it has redacted could not be released in a similarly anonymized form.

**B.      Any Actual Privacy Interest Presented Is
             Outweighed By The Public's Interest in Disclosure**

Even if the redacted information does give rise to substantial privacy interests, the public interest in the information outweighs that interest. The Supreme Court has explained that privacy must be weighed against "preservation of the basic purpose of the Freedom of Information Act to open agency action to the light of public scrutiny." *Dep't of Air Force v. Rose*, 425 U.S. 352, 372 (1976) (internal quotation marks omitted). That purpose is served when disclosing information "would 'she[d] light on an agency's performance of its statutory duties' or otherwise let citizens know 'what their government is up to.'" *U.S. Dep't of Def. v. Fed. Labor Relations Auth.*, 510 U.S. 487, 497 (1994) (quoting *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989)). The D.C. Circuit has emphasized the importance of FOIA's role in "permit[ting] the public to decide *for itself* whether government action is proper." *Int'l Bhd. of Elec. Workers, Local No. 41 v. U.S. Dep't of Hous. & Urban Dev.*, 763 F.2d 435, 436 (D.C. Cir. 1985) (quoting *Wash. Post Co. v. U.S. Dep't. of Health & Human Servs.*, 690 F.2d 252, 264 (D.C. Cir. 1982)).

37

The redacted information here would clearly shed light on the government's performance of its statutory duties and generally let citizens know what their government is up to. Courts have already held that there is "a clear public interest in . . . assess[ing]. . . DOD's care . . . of the [Guantánamo] detainees." *Associated Press v. U.S. Dep't of Def.*, 462 F. Supp. 2d 573, 577 (S.D.N.Y. 2006); *see also In re Guantánamo Bay Detainee Litig.*, 624 F. Supp. 2d 27, 37 (D.D.C. 2009) (noting that the "[p]ublic interest in Guantánamo Bay generally . . . has been unwavering"). Information regarding noncompliant detainees and how the government deals with them is a crucial aspect of assessing its care of these detainees, especially given the backdrop of detainee mistreatment at the prison facility. Descriptions of personnel actions are of similar importance in enabling the public's assessment of the government's care of the prison facility operation. Given that the government's management of the facility has led to claims of sex discrimination against female service members and hazardous work environments that may have resulted in the deaths of several service members, Pls.' SMF ¶ 53, an understanding of how the government handles personnel actions is of clear public interest. The public interest in the redacted information, then, outweighs any private interest in this information.

## V.   THE GOVERNMENT FAILS TO DEMONSTRATE THAT INFORMATION WAS PROPERLY WITHHELD UNDER EXEMPTION 7

Plaintiff challenges the government's Exemption 7(E) redactions on Record 257. Record 257 is a memorandum which "describes in minute details the procedures to be followed by guard personnel to confirm if a detainee is on hunger strike and, if so, the steps that need to be taken, including the specific techniques used for enteral feeding." McCubbin Decl. ¶ 76. The government contends that release of the record "could reasonably be expected to disclose guidelines, techniques, and procedures for law enforcement investigations or prosecutions and could also reasonably be expected to risk circumvention of the law," and that release could

permit detainees to "better understand how the guard force operates and government strategies for ensuring the security of detention operations, which could be used to evade those protocols." *Id.* ¶ 77.  These cursory justifications are insufficient.

Under Exemption 7(E), agencies may withhold "records or information compiled for law enforcement purposes" if releasing the documents "(E) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law."  5 U.S.C. § 552(b)(7).  To justify withholding information under this exemption, an agency must first show that the requested documents contain "records or information compiled for law enforcement purposes."  *Id.*  The D.C. Circuit has held that agencies can meet this threshold burden by establishing a "rational nexus between the investigation and one of the agency's law enforcement duties and a connection between an individual or incident and a possible security risk or violation of federal law."  *Blackwell v. FBI*, 646 F.3d 37, 42 (D.C. Cir. 2011) (internal quotation marks and citation omitted).  The D.C. Circuit has also held that Exemption 7(E) "looks not just for circumvention of the law, but for a risk of circumvention; not just for an actual or certain risk of circumvention, but for an expected risk; not just for an undeniably or universally expected risk, but for a reasonably expected risk; and not just for certitude of a reasonably expected risk, but for the chance of a reasonably expected risk."  *Id.* at 42 (citation omitted).

The government has not established that the disclosure of Record 257 would reveal "techniques and procedures for law enforcement investigations or prosecutions" or "guidelines for law enforcement investigations or prosecutions."  5 U.S.C. § 552(b)(7)(E).  The government itself acknowledges that "Congress intended that Exemption 7(E) protect from disclosure

techniques and procedures used to prevent and protect against crimes, as well as techniques and procedures used to investigate crimes after they have been committed." Def.'s Mem. 37. But the government does not describe how the force-feeding procedures relate to "prevent[ing] or protect[ing] against crimes" or to "investigat[ing] crimes after they have been committed." Indeed, it is unclear what crime, exactly, the government thinks that hunger strikers are committing such that force-feeding them constitutes an investigation of that crime.

The government marshals only one out-of-circuit case in support of its claimed exemption, but this case does not stand for the proposition the government claims it does. In *Jordan v. U.S. Dep't of Justice*, 668 F.3d 1188 (10th Cir. 2011), a federal prisoner sought, as relevant here, any psychological and psychiatric files the Federal Bureau of Prisons (FBoP) had on him. The Bureau released a partially redacted version of the files. While the Tenth Circuit upheld the Exemption 7(E) redaction, its holding rested primarily on the fact that, as the redacted portion of the records "advised all staff regarding appropriate actions to take with regard to [Mr. Jordan]," its release would "disclose guidelines for a potential law enforcement investigation by giving information [FBoP] staff would be likely to use in investigating Mr. Jordan's conduct while incarcerated." *Id.* at 1201. The court also added that "knowing BOP strategy could make it easier for Mr. Jordan to subvert it, which 'could reasonably be expected to risk circumvention of the law' given his history of violence and violent threats." *Id.*

Here, by contrast, there is no evidence that the detainees are likely to be investigated for conduct while incarcerated, and so there is no "guideline[] for a potential law enforcement investigation" that would be disclosed by redacting Record 257. Moreover, the Tenth Circuit rested its holding that the document's release would risk circumvention of the law on the fact that the requesting inmate had a "history of violence and violent threats." *Id.* Conversely, the

government does not provide any specific history of violence or noncompliance to support its claim that disclosing Record 257 would risk circumvention of the law.  The government has failed to establish that releasing Record 257 in full would disclose law enforcement techniques. Consequently, its redaction does not fall under Exemption 7(E).

Assuming arguendo that releasing Record 257 would reveal law enforcement techniques, its disclosure does not pose a reasonable risk of circumvention of the law.  The D.C. Circuit has explained that to justify withholding information under Exemption 7(E), an agency must demonstrate that "release of a document might increase the risk 'that a law will be violated or that past violators will escape legal consequences.'" *Pub. Emps. for Envtl. Responsibility v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mexico*, 740 F.3d 195, 205 (D.C. Cir. 2014) (quoting *Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1193 (D.C. Cir. 2009)). Here, the release of the government's force-feeding procedures would not increase the risk that legal violations would occur. The detainees already at Guantánamo are presumably aware of the procedures, as dozens have already been subjected to them. The risk of "future detainees" using this information to circumvent law enforcement, to which the government refers repeatedly in its brief and declaration, *see, e.g.*, Def.'s Mem. 16, 17; McCubbin Decl. ¶¶ 22, 29, is speculative at best.  A future detainee would have to (1) learn of the procedures, (2) learn to circumvent the procedures, (3) engage in hostilities against the United States, (4) be captured by the United States or its allies, (5) begin a hunger strike, and, finally, (6) circumvent the force-feeding procedures. This chain is so attenuated as to lack credibility.

In any event, much of the redacted information in Record 257 is already public. Record 257 itself claims that "DoD hunger strike policy and procedures mirrors those followed by FBoP to the maximum extent possible."  Record 257, at Bates 257. FBoP's general procedures, in turn,

are already published in the Code of Federal Regulations.  *See* 28 CFR §§ 549.60-549.66

(providing, for example, that "[m]edical staff shall take and record weight and vital signs at least

once every 24 hours while the inmate is on a hunger strike").  FBoP has published even more

detailed guidelines for these procedures on its website.  Pls.' SMF ¶ 33 (describing, for example,

that "involuntary medical treatment" of hunger strikers "[n]ormally . . . is to consist of a

nasogastric tube for feeding. If unsuccessful or medically inappropriate, then intravenous fluids

and hyperalimentations intravenously may be necessary"). Given that much of the information

redacted in Record 257 is already public, and the speculative link between its release and future

circumvention of the law at Guantánamo, the government's claim that releasing this information

would "increase the risk that a law will be violated or that past violators will escape legal

consequences," *Pub. Emps. for Envtl. Responsibility*, 740 F.3d at 205 (internal quotation marks

omitted), is unsubstantiated.

## VI.     THE COURT SHOULD REVIEW A SAMPLE OF DOCUMENTS *IN CAMERA*

As evidenced by the arguments above, the propriety of many of the government's

redactions may turn on factual determinations that require this Court to take a look at the

information redacted.  FOIA grants judges broad discretion to "examine the contents of such

agency records in camera to determine whether such records or any part thereof shall be withheld

under any of the exemptions."  5 U.S.C. § 552(a)(4)(B).  The D.C. Circuit has explained that the

"ultimate criterion is simply this: Whether the district judge believes that in camera inspection is

needed."  *Ray v. Turner*, 587 F.2d 1187, 1195 (D.C. Cir. 1978).  And "[i]n cases that involve a

strong public interest in disclosure," such as the instant matter, there is "a greater call for in

camera inspection."  *Allen v. CIA*, 636 F.2d 1287, 1299 (D.C. Cir. 1980) (disavowed on other

grounds by *Founding Church of Scientology v. Smith*, 721 F.2d 828 (D.C. Cir. 1983)).

Given the public interest in this case, Plaintiffs respectfully ask the court to conduct an *in camera* review of at least a representative sample of the documents at issue.[9]

## CONCLUSION

For the foregoing reasons, the Court should deny the government's motion for summary judgment and grant Plaintiff's cross-motion for summary judgment.

Dated: November 17, 2017                     Respectfully Submitted,


                                             */s/* David A. Schulz
                                             David A. Schulz (Bar No. 459197)
                                             919 Third Avenue, 37th Floor
                                             New York, NY 10022
                                             Tel: (212) 850-6103
                                             Email: schulzd@ballardspahr.com

                                             John Langford, supervising attorney
                                             Sebastian Brady (law student intern)
                                             Mike Karpman (law student intern)
                                             Delbert Tran (law student intern)
                                             MEDIA FREEDOM &
                                                 INFORMATION ACCESS CLINIC
                                             ABRAMS INSTITUTE
                                             Yale Law School[10]
                                             P.O. Box 208215
                                             New Haven, CT 06520
                                             Tel: (203) 432-9387
                                             Fax: (203) 432-3034
                                             Email: schulzd@ballardspahr.com

                                             *Counsel for Plaintiffs*

---

[9] The documents should include Records 31, 72, 129, 140, 168, 240, 248, 265, 278, 281, 288, 295, 297, 307, 317, 320, 321, 326, 328, 331, and 335.

[10] This motion has been prepared in part by a clinic associated with the Abrams Institute for Freedom of Expression and the Information Society Project at Yale Law School, but does not purport to present the school's institutional views, if any.

43

**CERTIFICATE OF SERVICE**

I certify that on November 17, 2017, I electronically filed the foregoing status report using the Court's CM/ECF system.

/s/ David A. Schulz
David A. Schulz (Bar No. 459197)
919 Third Avenue, 37th Floor
New York, NY 10022
Tel: (212) 850-6103
Email: schulzd@ballardspahr.com

*Attorney for Plaintiffs*