**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CAROL ROSENBERG,
MIAMI HERALD MEDIA COMPANY,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF
DEFENSE,

Defendant.

Civil No. 1:17-cv-437-APM

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S RENEWED
MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFFS'
RENEWED CROSS-MOTION FOR SUMMARY JUDGMENT AND
PARTIAL RECONSIDERATION**

David A. Schulz (Bar No. 459197)
John Langford, supervising attorney
MEDIA FREEDOM & INFORMATION
   ACCESS CLINIC
ABRAMS INSTITUTE
Yale Law School
919 Third Avenue, 37th Floor
New York, NY 10022
Tel: (212) 850-6103
Email: schulzd@ballardspahr.com

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ...........................................................................................................i

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ..................................................................................................................1

BACKGROUND ....................................................................................................................4

   A.   Statutory Framework ..................................................................................................4

   B.   The FOIA Request at Issue ........................................................................................5

   C.   The Court's Prior Order..............................................................................................6

   D.   Procedural Posture......................................................................................................9

ARGUMENT.........................................................................................................................10

   I.   THIS COURT CORRECTLY HELD THAT FOIA'S "FORESEEABLE HARM"
      STANDARD REQUIRES THE GOVERNMENT TO DEMONSTRATE THAT
      DISCLOSURE WOULD HARM AN AGENCY'S DELIBERATIVE PROCESS.........10

   II.   DOD STILL FAILS TO CARRY ITS BURDEN TO DEMONSTRATE
      REASONABLY "FORESEEABLE HARM" UNDER EXEMPTION 5 ........................15

   III.  DOD STILL FAILS TO DEMONSTRATE THAT INTERNAL EXPRESSIONS
      OF OPINION ABOUT A COURT RULING ARE COVERED BY EXEMPTION
      5.........................................................................................................................28

   IV.  DOD STILL FAILS TO DEMONSTRATE THAT CERTAIN RECORDS ARE
      PROPERLY CLASSIFIED AND THEREFORE SUBJECT TO EXEMPTION 1..........30

   V.   DOD OFFICIALLY ACKNOWLEGED TALLIES OF HUNGER STRIKERS
      AND FORCE-FED DETAINEES AND THESE MAY NOT BE WITHHELD .............36

CONCLUSION......................................................................................................................39

# TABLE OF AUTHORITIES

**Cases**                                                            **Page(s)**

*Abtew v. U.S. Dep't of Homeland Sec.*,
   808 F.3d 895 (D.C. Cir. 2015) ................................................................28

*ACLU v. U.S. Dep't of Def.*,
   628 F.3d 612 (D.C. Cir. 2011) ................................................................37

*Coastal States Gas Corp. v. Dep't of Energy*,
   617 F.2d 854 (D.C. Cir. 1980) ................................................................29

*Defs. of Wildlife v. U.S. Border Patrol*,
   623 F. Supp. 2d 83 (D.D.C. 2009) ..................................................... 33, 34

*Dep't of Interior v. Klatham Water Users Protective Ass'n*,
   532 U.S. 1 (2001) ................................................................................15

*Ecological Rights Found. v. FEMA*,
   No. 16-cv-05254, 2017 WL 5972702 (N.D. Cal. Nov. 30, 2017) ........................13

*Filebark v. U.S. Dep't of Transp.*,
   555 F.3d 1009 (D.C. Cir. 2009) ..............................................................37

*Judicial Watch, Inc. v. U.S. Dep't of Def.*,
   715 F.3d 937 (D.C. Cir. 2013) ................................................................31

*Judicial Watch, Inc. v. U.S. Dep't of Def.*,
   847 F.3d 735 (D.C. Cir. 2017) ................................................................15

*Lesar v. U.S. Dep't of Justice*,
   636 F.2d 472 (D.C. Cir. 1980) ................................................................31

*Mead Data Cent., Inc. v. U.S. Dep't of Air Force*,
   566 F.2d 242 (D.C. Cir. 1977) ................................................................33

*Nat'l Sec. Counselors v. CIA*,
   960 F. Supp. 2d 101 (D.D.C. 2013) ..........................................................29

*NLRB v. Robbins Tire & Rubber Co.*,
   437 U.S. 214 (1978) ..............................................................................1

*NLRB v. Sears, Roebuck & Co.*,
   421 U.S. 132 (1975) ............................................................................15

*Roth v. U.S. Dep't of Justice,*
  642 F.3d 1161 (D.C. Cir. 2011) ........................................................................35

*Senate of the Com. of P. R. on Behalf of Judiciary Comm. v. U.S. Dep't of Justice,*
  823 F.2d 574 (D.C. Cir. 1987) .........................................................................29

**Statutes**

5 U.S.C. § 552 ........................................................................................*passim*

Act of Nov. 21, 1974,
  Pub. L. No. 93-502, 88 Stat. 1561.....................................................................1

Electronic Freedom of Information Act Amendments of 1996,
  Pub. L. No. 104-231, 110 Stat. 3048 (Oct. 2, 1996) ............................................1

OPEN Government Act of 2007,
  Pub. L. No. 110-1175, 121 Stat. 2524................................................................2

FOIA Improvement Act of 2016,
  Pub. L. No. 114-185, 130 Stat. 538....................................................................2

**Other Authorities**

Exec. Order No. 13,526, 75 Fed. Reg. 707 (Dec. 29, 2009) ...............................31, 36

Fed. R. Civ. P. 54(b) ........................................................................................37

H.R. Rep. No. 114-391 (2016) ...........................................................................14

Office of Information Policy, *FOIA Update: OIP Guidance: Applying The "Forseeable*
  *Harm" Standard Under Exemption Five*, Dep't of Justice (Jan. 1, 1994) ........................*passim*

S. Rep. No. 114-4 (2015) ..................................................................................12

## INTRODUCTION

Last September, this Court granted in part and denied in part the parties' cross-motions for summary judgment in this Freedom of Information Act ("FOIA") lawsuit. Finding insufficient the explanations provided by the Department of Defense for withholding certain information requested by *Miami Herald* reporter Carol Rosenberg, the Court gave the government a second bite at the apple. It afforded the Department of Defense an opportunity to supplement the record and provide legally sufficient justifications for withholding certain categories of information. The government now files supplemental submissions and renews its motion for summary judgment, but the government's supplemental materials fail to address the deficiencies identified by this Court.

The central issue in this case remains whether and to what extent Congress's latest attempt to stop agencies from overwithholding information the public legitimately should know has any teeth. Fifty-three years ago, Congress enacted FOIA "to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). Over the decades, Congress has repeatedly amended FOIA to ensure that it continues to serve its vital purpose.

- In 1974 on the heels of Watergate, Congress overrode President Ford's veto to narrow FOIA's exemptions, impose strict time limits for responding to requests, and require the disclosure of segregable, non-exempt portions of records. Act of Nov. 21, 1974, Pub. L. No. 93-502, 88 Stat. 1561.

- In 1996, President Clinton signed into law the Electronic Freedom of Information Act Amendments to ensure that FOIA's disclosure mandates were applied fully to electronic records and to require agencies to create and maintain electronic reading-rooms to facilitate public access to agency records. Pub. L. No. 104-231, 110 Stat. 3048 (Oct. 2, 1996).

- In 2007, President Bush signed into law the OPEN Government Act to limit agencies' ability to impose search and production costs on reporters and to increase all requesters' access to attorneys' fees when litigation was required to obtain disclosure in order to incentive agencies to produce more records.  Pub. L. No. 110-1175, 121 Stat. 2524.

In June 2016, Congress and President Obama updated FOIA once again in the aptly named FOIA Improvement Act of 2016.  Pub. L. No. 114-185, 130 Stat. 538.  According to Congress, the most important improvement in the 2016 Act is its codification of a new "foreseeable harm" standard for withholding records.  This standard sharply curtails agencies' ability to deny access to information under FOIA's "discretionary" exemptions, including specifically Exemption 5's carve-out for deliberative materials at issue here.

Before 2016, agencies were statutorily permitted to withhold any information that fell within the scope FOIA's discretionary exemptions.  In enacting the FOIA Improvement Act, Congress concluded that agencies had been abusing this discretionary authority and withholding vast troves of government documents that technically fell within one of FOIA's discretionary exemptions but whose release would not harm any legitimate governmental interest protected by FOIA.  To stop that abuse, Congress limited agency discretion by codifying the so-called "foreseeable harm" standard.  This standard permits agencies to withhold documents under one of FOIA's discretionary exemptions only if they can demonstrate a "reasonably foreseeable" harm that disclosure would inflict upon an interest protected by the exemption.  5 U.S.C. § 552(a)(8)(A).

In its renewed request for summary judgment, the government continues to assert that FOIA's new "foreseeable harm" standard has no practical effect.  At issue is a reporter's narrow request for certain communications concerning the Guantánamo Bay detention center between General John F. Kelly and a presidential counterterrorism advisor that were had during the time General Kelly was serving as Commander of the Department of Defense's U.S. Southern

Command ("SOUTHCOM").  The government has identified 221 emails and 92 attachments to those emails responsive to Rosenberg's request.  Relevant here, the government continues to seek to withhold information from those records under FOIA's deliberative process exemption (Exemption 5) and national security exemption (Exemption 1).

In seeking summary judgment initially, the government defended all of its Exemption 5 withholdings on the ground that FOIA's new "foreseeable harm" standard imposes no additional obligation on agencies under Exemption 5.  This Court squarely rejected that position in denying summary judgment last September.  The government's renewed motion continues to insist that the "foreseeable harm" standard does not impose any additional burden under Exemption 5 and argues that *all* of its Exemption 5 withholdings are appropriate in any event.  In support, the government submits a new declaration that does nothing more than explain how the records fall within Exemption 5 and conclusorily states that disclosure of *any* of the information withheld under Exemption 5 will harm future deliberations about the operation of Guantánamo Bay.

The Court's earlier order also held that several of the government's justifications for withholding information under Exemption 1 were lacking.  With respect to the majority of the Exemption 1 withholdings, the government's supplemental submissions similarly fail to provide a meaningful response to the insufficiencies identified by the Court in September.

As demonstrated below, the government still fails to meet its burden to justify the withheld information, and the Court should now enter summary judgment for plaintiffs on the redactions remaining in dispute.  Doing so is particularly important to vindicate Congress's clear intent in codifying the "foreseeable harm" standard and to ensure that agencies are not able to shirk and minimize their new statutory obligation.

## BACKGROUND

The full background of this case is set forth in this Court's September 27, 2018 Memorandum Opinion and Order ("Mem. Op."), ECF No. 27, at 4–7, and in plaintiffs' memorandum in opposition to defendant's initial motion for summary judgment and in support of plaintiffs' initial cross-motion for summary judgment ("Pls.' Mem."), ECF No. 19-1, at 1–6. Only a brief summary is provided here for context.

### A.  Statutory Framework

The Freedom of Information Act ("FOIA") requires federal agencies to make agency records promptly available to any member of the public upon request, unless those records fall within one of nine narrowly construed exemptions.  5 U.S.C. § 552(a)(3), (b).  Most of those exemptions, including Exemption 5 at issue here, are discretionary, permitting agencies to withhold information if they choose; some, including Exemption 1 at issue here, are mandatory, requiring agencies to withhold information whenever they are applicable.  *See* Mem. Op. at 4 n.1; Pls.' Mem. at 8.  None of FOIA's nine exemptions "obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act."  Mem. Op. at 2.

Through the FOIA Improvement Act of 2016, Congress enacted a new "foreseeable harm" standard for withholding information otherwise subject to a discretionary exemption. This standard permits an agency to withhold information only if "(I) the agency reasonably foresees that disclosure would harm an interest protected by [a FOIA] exemption described in [5 U.S.C. § 552(b)]; or (II) disclosure is prohibited by law[.]"  5 U.S.C. § 552(a)(8)(A), *see* Mem. Op. at 3–4.  "Stated differently, pursuant to the FOIA Improvement Act, an agency must release a record—even if it falls within a FOIA exemption—if releasing the record would not reasonably harm an exemption-protected interest and if its disclosure is not prohibited by law."  Mem. Op.

at 2–3. Congress made clear that codifying the "foreseeable harm" standard was meant to reverse "a growing and troubling trend" among agencies of "relying on . . . discretionary exemptions to withhold large swaths of Government information, even though no harm would result from disclosure." *Id.* at 3.

### B.  The FOIA Request at Issue

Over the past 18 years, plaintiff Carol Rosenberg, an award-winning reporter for the *Miami Herald*, has covered the operations of the U.S. Southern Command ("SOUTHCOM") and its operation of the Guantánamo Bay detention center.  Pls.' Combined Statement of Material Facts ("Pls.' SMF") ¶¶ 64–66, ECF No. 19-2.  Relevant here, she covered General John F. Kelly's career during the years he led SOUTHCOM and had operational responsibility for the Guantánamo Bay detention center.

After it became apparent that President-Elect Donald Trump was considering General Kelly for a senior national security role in his administration, on November 11, 2016 Rosenberg submitted a narrow FOIA request to SOUTHCOM seeking emails sent by General Kelly to Lisa Monaco, Assistant to President Obama for Homeland Security and Counterterrorism.  McCubbin Decl. Ex. 1, ECF No. 18-2.  Rosenberg believed that the request would lead to the timely disclosure of information that would promote an informed public debate about General Kelly's views on issues related to national security and promote effective democratic oversight.

On November 23, 2016, SOUTHCOM acknowledged receipt of Rosenberg's request and denied her request for expedited processing.  McCubbin Decl. Ex. 2.  Rosenberg filed an administrative appeal, but  SOUTHCOM never acknowledged or responded to the appeal and failed otherwise to respond to Rosenberg's FOIA request.  Pls.' SMF ¶ 4.

On March 30, 2017, Rosenberg and the Miami Herald Media Company filed this lawsuit

to compel the government to expedite its response and to disclose the requested records.  Compl.,

ECF No. 1.  After the government filed its answer, the parties negotiated a production schedule

for the government to locate and produce responsive records.  *See* Joint Status Report, ECF No.

15; Order, ECF No. 16.  Over the next several months, the government produced 256 email

communications between General Kelly and Lisa Monaco, as well as 92 attachments to those

emails.  Langford Decl. Ex. PP, ECF Nos. 19-5–19-6.[1]  The responsive records generally fall

into three categories: (1) weekly status reports (or "JTF-GTMO" updates), including cover

emails; (2) substantive follow-up emails; and (3) emails with redacted subject lines and fully or

largely redacted bodies.  *Id.*; *see* Pls.' Mem. at 4–6 (describing the records in greater detail).  The

government redacted information from many of the responsive records, citing FOIA Exemptions

1, 3, 5, 6, and 7(E).  *See* Langford Decl. Ex. PP, ECF Nos. 19-5–19-6.  With respect to

Exemption 5, the government relied solely on the deliberative process privilege.  *See* Mem. of

Points & Authorities in Supp. of Def.'s Mot. Summ. J. ("Def.'s Mem.") at 26, ECF No. 18-1.

Between October 2017 and January 2018, the parties briefed cross-motions for summary

judgment.  *See* ECF Nos. 18, 19–20, 22–24.  Notably, with respect to the government's

invocation of FOIA's Exemption 5, plaintiffs argued that the government failed to address

FOIA's "foreseeable harm" standard.  *See* Pls.' Mem. at 10–17.

**C.  The Court's Prior Order**

On September 27, 2018, this Court entered a Memorandum Opinion and Order granting

in part and denying in part both motions for summary judgment.  Mem. Op.  Relevant here, the

---

[1] The government determined that 35 emails included in email chains with responsive
records were not responsive, leaving a total of 221 emails.  *See* Langford Decl. Ex. PP, ECF Nos.
19-5–19-6.

Court denied the government's motion for summary judgment as to all of its Exemption 5 withholdings and some of its Exemption 1 withholdings.  *Id.* at 45.

With respect to Exemption 5, the Court held that the "foreseeable harm" standard codified by Congress in 2016 requires the government to "explain how a particular Exemption 5 withholding would harm the agency's deliberative process."  *Id.* at 12.  The Court concluded that the government could adopt "a categorical approach—that is, group together like records"—in meeting its burden, but must still "explain the foreseeable harm of disclosure for each category." *Id.*  The Court held that the government had failed to meet that obligation in this case but allowed the government an opportunity to supplement its initial explanation.  *Id.* at 13–15.

In addition, the Court conducted *in camera* review of certain Exemption 5 redactions that plaintiffs had identified from context as not likely containing information that was deliberative in nature.  The Court concluded that the government failed to demonstrate that its redaction of General Kelly's opinions on the merits of a military commission ruling were deliberative and therefore properly withheld under Exemption 5.  *Id.* at 16–17.  Rather than grant plaintiffs summary judgment, the Court offered the government another opportunity to explain why the redacted information falls within Exemption 5's ambit.  *Id.* at 17.

With respect to the Exemption 1 withholdings, the Court denied the government's summary judgment motion with respect to several categories of records because it found the government's justifications lacking.  Relevant here, the Court denied the government's motion with respect to (1) information concerning detainees' reactions upon learning of their movement to third countries, *id.* at 25–28; (2) discussions of congressional matters related to JTF-GTMO operations, *id.* at 29–30; (3) a discussion of a detainee movement operation that was postponed,

*id.* at 30–31; and (4) information on intelligence activities related to detention operations, *id.* at 31–32.

As for the first and second categories, the Court concluded that the government failed to provide a logical and plausible explanation of how disclosure of the records could reasonably be expected to cause damage to the national security. *Id.* at 25–32. With respect to the third category, the Court found that the government failed to demonstrate that withheld information was actually "foreign government information" that could be classified because it failed to demonstrate that the information was intended to be held in confidence, as required by the Executive Order governing classification. *Id.* at 30–31 (citing EO 13,526 § 6.1(s)). As to the fourth category, the Court concluded that the government failed to demonstrate both that disclosure could reasonably be expected to cause damage to the national security and that the specific information withheld "pertains" to intelligence activities as required by EO 13,526 § 1.4(c). Mem. Op. at 31–32. Rather than grant summary judgment to plaintiffs, the Court offered the government an opportunity to supplement the record with respect to those withholdings. *Id.* at 25–32, 45.

The Court also granted, in part, the government's summary judgment motion with respect to its withholdings of the tally of hunger strikers and force-fed detainees under Exemption 1. *Id.* at 23–24 n.9. Plaintiffs had explained that the government could not withhold that information because it has officially acknowledged the tally in the past, citing to a *Miami Herald* database that tracks daily numbers of hunger strikers and instances of force-feeding maintained by Rosenberg and Lazaro Gamio. *See* Pls.' Mem. at 26; Pls.' SMF ¶ 41. When the government objected that the newspaper's database does not itself meet the requirements for official acknowledgment, plaintiffs explained that the database exhaustively documents routine official

acknowledgement of tallies received from the government itself.  Pls.' Reply at 14, ECF No. 24.

Providing an example of an official acknowledgment the newspaper received, plaintiffs

identified the official acknowledgement of the May 15, 2013, tally in the database.  *Id.*  The

Court granted plaintiffs' motion for summary judgment on the May 15, 2013, tally based upon

the evidence that that tally had been "officially acknowledged" but granted the government

summary judgment with respect to the rest of the reported tallies because "Plaintiffs . . . failed to

bring to the court's attention the specific official disclosures that support each count in the tally"

and therefore did not "me[e]t their burden to prove that these figures are 'official disclosures'

that overcome DOD's invocation of Exemption 1."  Mem. Op. at 23–24 n.9.

### D.  Procedural Posture

On November 21, 2018, the government filed a renewed motion for summary judgment

with respect to its Exemption 5 withholdings and some of those Exemption 1 withholdings

identified above.  Def.'s Renewed Mot. for Summ. J., ECF No. 31.  Notably, the government

now concedes that the information withheld in Records 272 and 304 concerning discussions of

congressional matters related to JTF-GTMO operations is not properly classified, with the

exception of a detainee movement order number in Record 272.  Def.'s Mem. of Points & Auths.

in Supp. of Def.'s Renewed Mot. for Summ. J. ("Def.'s Second Mem.") at 14, ECF No. 31-1.  In

support of its renewed motion, the government submitted a public supplemental declaration from

John Mulkeen, Deputy J34 within the Office of Operations Directorate, SOUTHCOM.  Decl. of

John Mulkeen ("Mulkeen Decl."), ECF No. 31-2.  The government also submitted *ex parte* a

classified and sealed supplemental declaration.  *See* Def.'s Second Mem. at 2–3.

Plaintiffs now submit their renewed cross-motion for summary judgment and opposition

to defendant's renewed motion for summary judgment, along with an additional supporting

declaration from Carol Rosenberg.  The new declaration demonstrates that the government has indeed official acknowledged all of the hunger strike and enteral feeding tallies in the database compiled by the *Miami Herald* and supports plaintiffs' request for reconsideration of the denial of summary judgment on these tallies.

## ARGUMENT

### I.     THIS COURT CORRECTLY HELD THAT FOIA'S "FORESEEABLE HARM" STANDARD REQUIRES THE GOVERNMENT TO DEMONSTRATE THAT DISCLOSURE WOULD HARM AN AGENCY'S DELIBERATIVE PROCESS

The government is wrong in contending that the Court's earlier Memorandum Opinion and Order misinterprets FOIA's new "foreseeable harm" standard.  Def.'s Second Mem. at 14–15.  The 2016 FOIA amendment does impose an additional and important burden on agencies seeking to withhold information under FOIA's discretionary exemptions, as the Court correctly recognized.  Mem. Op. at 9–15.  Specifically, to satisfy the "foreseeable harm" standard, the government must explain how a particular Exemption 5 withholding, or a particular category of Exemption 5 withholding, would harm the agency's deliberative process.  *Id.* at 12.

While the Court's holding follows straightforwardly from the plain text of the "foreseeable harm" provision, *see* 5 U.S.C. § 552(a)(8)(A), it is buttressed by the standard's origins, its early applications, and the only other judicial decision construing the foreseeable harm standard.  As previously explained, the "foreseeable harm" standard originated in a memo issued by Attorney General Janet Reno in 1993.  Pls.' Mem. at 8 n. 4; Pls.' SMF ¶ 26.  That memo made it "the policy of the Department of Justice to defend the assertion of a FOIA exemption only in those cases where the agency reasonably foresees that disclosure would be harmful to an interest protected by that exemption."  Pls.' SMF ¶ 26.  The policy was reversed in 2001 by Attorney General John Ashcroft, Pls.' SMF ¶ 28, and then re-instated in 2009 by Attorney General Eric Holder, Pls.' SMF ¶ 29, before Congress made it the statutory standard.

After Attorney Generals Janet Reno and Eric Holder instituted the policy, the Department of Justice's Office of Information Policy (OIP) issued guidance on how the foreseeable harm standard should be applied in withholding information under Exemption 5's deliberative process privilege.  Langford Decl. Exs. U–V.  In the Holder Guidance, OIP recognized that the "foreseeable harm" standard held "the greatest promise" for increased transparency under Exemption 5 specifically.  *Id.* Ex. V at 5.  The Reno Guidance clarified that the "foreseeable harm" standard imposes exactly the burden under Exemption 5 that this Court held it to impose:

> In each case, a FOIA officer should now try to determine whether disclosure of the information in question would foreseeably harm the basic institutional interests that underlie the deliberative process privilege in the first place.  In other words, he or she must consider whether it "would actually inhibit candor in the decision-making process" to disclose that *particular* information to the public at that *particular* time.

*Id.* Ex. U at 2.

OIP's 1994 guidance laid out eight specific factors for agencies to consider in determining whether the disclosure of information otherwise protected by the deliberative process privilege may be withheld under the "foreseeable harm" standard:

- **The nature of the decision involved**—Some agency decisions are highly sensitive and perhaps even controversial; most of them are far less so.

- **The nature of the decisionmaking process**—Some agency decisionmaking processes require total candor and confidentiality; many others are not nearly so dependent.

- **The status of the decision**—If the decision is not yet made, then there is a far greater likelihood of harm from disclosure; conversely, with decisions already made there is far less likelihood.

- **The status of the personnel involved**—Are the same agency employees, or other employees who are similarly situated, likely to be affected by the disclosure?

- **The potential for process impairment**—How much room is there for actual diminishment of deliberative quality if the personnel involved do feel inhibited by potential disclosure?

- **The significance of any process impairment**—In some cases, any anticipated "chilling effect" on the agency's decisionmaking process might be so minimal as to be practically negligible.

- **The age of the information**—While there is no universally applicable age-based litmus test, the sensitivity of all information fades with the passage of time.

- **The sensitivity of individual record portions**—Apart from any other factor or consideration, FOIA officers ultimately must focus on the individual sensitivity of each item of information.

*Id.* (citations omitted).  Finally, OIP specifically noted that the burden for withholding information related to "mundane" agency decisions is higher than the burden for withholding information related to a "policy judgment in the decisional process."  *Id.*

In 2016, Congress decided to codify DOJ's "foreseeable harm" standard, viewing codification of the "foreseeable harm" standard as a critical and needed change to FOIA.  *See* Pls.' Mem. at 11–17; Pls.' Reply at 1–3.  The Senate Report explains that the change was necessary to halt "a growing and troubling trend" of agencies using FOIA's discretionary exemptions "to withhold large swaths of Government information, even though no harm would result from disclosure."  Langford Decl. Ex. Q at 3.  Congress was, moreover, particularly concerned with agencies' routine invocation of Exemption 5 to withhold information that should be disclosed under FOIA.  *Id.*  The Senate Report for the FOIA Improvement Act cites the government's 79,000 invocations of Exemption 5 in 2012 as a stark example of the over-withholding of important information.  *Id.*

To reverse the trend of overwitholding, the Senate Report mirrors OIP's guidance that the "foreseeable harm" standard requires a determination to be made "as to whether the agency reasonably foresees that disclosing that particular document, given its age, content, and character, would harm an interest protected by the applicable exemption."  *Id.* at 8.  The Senate

Report further underscores that the goal of the new "foreseeable harm" requirement is to ensure that "[t]he Government . . . not keep information confidential merely because public officials might be embarrassed by disclosure, because errors and failures might be revealed, or because of speculative or abstract fears." *Id.*

Since Congress's codification of the "foreseeable harm" standard, as the Court noted in its earlier opinion, only one other court has addressed the application of the "foreseeable harm" standard to deliberative process withholdings and it also held that the new standard imposes an additional obligation on agencies. *Ecological Rights Found. v. FEMA*, No. 16-cv-05254, 2017 WL 5972702, at *6 (N.D. Cal. Nov. 30, 2017). Specifically, the Northern District of California held that agencies must strictly comply with the "foreseeable harm" standard when seeking to withhold documents under the deliberative process privilege and "explain how disclosure would . . . discourage candid discussion." *Id.*

In short, the Court's holding that the "foreseeable harm" standard requires the government to explain how a particular withholding or category of withholding under Exemption 5 would harm the agency's deliberative process comports fully with the text of the codified "foreseeable harm" standard, the Department of Justice's prior guidance on the application of that standard, Congress's understanding and intent in enacting the standard, and the decision of the only other court to address the issue.

In asking the Court nevertheless to reverse its decision and hold now that the "foreseeable harm" standard imposes no new obligation on agencies that seek to withhold information under Exemption 5, the government argues circularly that Congress itself identified a foreseeable harm in choosing to protect predecisional material in the first place. Def.'s Second Mem. at 14–15. In its view, Congress identified a foreseeable harm "that applies to all predecisional, deliberative

materials, obviating the need for a more particularized showing that the release of particular information would be harmful" to an interest protected by Exemption 5. *Id.* at 15. The argument is devoid of merit and would render meaningless the "foreseeable harm" standard recently added to FOIA by Congress. The government's implicit request for reconsideration is baseless.

In support of its position, the government cites a single passage from the House Report on the FOIA Improvement Act of 2016, which clarifies that the "foreseeable harm" standard "does not alter the scope of information that is covered under an exemption." *Id.* at 14 (quoting H.R. Rep. No. 114-391, at 10 (2016)). But that same House Report states that the "foreseeable harm" standard requires agencies "to articulate both the nature of the harm and the link between the specified harm and specific information contained in [any] material withheld." H.R. Rep. No. 114-391, at 9 (2016). This passage makes clear that the House, like the Senate, understood its codification of the "foreseeable harm" standard to impose an additional obligation on agencies seeking to withhold information under FOIA's discretionary exemptions. In context, the passage the government relies on shows only that the House understood the new "foreseeable harm" standard to narrow the universe of records that may ultimately be *withheld* under FOIA's discretionary exemptions, but not the universe of records *covered* by those exemptions.

Each of the other authorities relied on by the government pre-date the codification of the "foreseeable harm" standard by Congress and are inapposite. Def.'s Second Mem. at 14–15. The government's position ignores the plain text of the "foreseeable harm" standard adopted by Congress, its origins, purpose, and previous application, and the only other decision applying the new standard to Exemption 5, and is plainly incorrect. *See supra* at pp. 10–13; Pls.' Mem. at. 7–10.

For all of these reasons, this Court should once again reject the government's attempt to blink away the most significant change Congress made in the FOIA Improvement Act of 2016. As this Court has already held, "the government must do more than perfunctorily state that disclosure of all the withheld information—regardless of category or substance—'would jeopardize the free exchange of information between senior leaders within and outside of the [DOD].'" Mem. Op. at 14 (quoting McCubbin Decl. ¶ 62).

## II. DOD STILL FAILS TO CARRY ITS BURDEN TO DEMONSTRATE REASONABLY "FORESEEABLE HARM" UNDER EXEMPTION 5

The government bears the burden of explaining how a particular Exemption 5 withholding, or a particular category of Exemption 5 withholding, would harm the agency's deliberative process. Mem. Op. at 12. While the government has now supplemented the record in an effort to satisfy the "foreseeable harm" requirement, *see* Def.'s Second Mem. at 15–24, its submissions still fall short.

It bears emphasis that the government must do more than demonstrate a potential chilling effect on any future internal conversation to satisfy the "foreseeable harm" standard under Exemption 5. The "deliberative process" privilege more narrowly extends to "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 148 (1975). Its "ultimate purpose" is to "prevent injury to the quality of agency decisions," *id.* at 151, "by protecting open and frank discussions among those who make them within the Government," *Dep't of Interior v. Klatham Water Users Protective Ass'n*, 532 U.S. 1, 9 (2001). As the D.C. Circuit has explained, "[t]he deliberative process privilege reflects the commonsense notion that agencies craft better rules when their employees can spell out in writing the pitfalls as well as strengths of policy options, coupled with the understanding that

employees would be chilled from such rigorous deliberation if they feared it might become public." *Judicial Watch, Inc. v. U.S. Dep't of Def.*, 847 F.3d 735, 739 (D.C. Cir. 2017). Accordingly, an agency must identify a reasonably foreseeable harm to truly deliberative, policy-setting conversations.

In addition, as OIP's previous guidance recognized, a relatively substantial harm to a relatively confidential deliberative process is required to satisfy the "foreseeable harm" standard for deliberative process privilege withholdings.  As noted above, OIP identified eight factors relevant to the determination of whether the disclosure of material covered by the deliberative process privilege would result in reasonably foreseeable harm.  *See* Langford Decl. Ex. U at 2. These factors include the gravity and nature of the decision at issue, the potential for process impairment, the status of a decision, and the age of the information at issue.  *Id.* at 2.  The purpose of this "foreseeable harm" analysis is to determine whether the release of material technically covered by the deliberative process privilege—*i.e.*, material that is both pre-decisional and deliberative—is reasonably likely *in fact* to result in the type of harm to future agency deliberations that Congress sought to avoid through Exemption 5.

In an effort to satisfy the "foreseeable harm" standard on its renewed motion for summary judgment, the government organizes its Exemption 5 withholdings into eight categories and offers the Declaration of John Mulkeen, Deputy J34 within the Office of Operations Directorate at SOUTHCOM, to support its contention that release of records in those categories would harm the agency's deliberative processes.  *See* Def.'s Second Mem. at 15–24; Mulkeen Decl. ¶¶ 15–28.  For the reasons below, the government still has not carried its burden to demonstrate reasonably foreseeable harm.  It repeatedly fails to address in any meaningful way

16

the factors recognized as relevant in the OIP guidance and instead continues to rely on conclusory claims of harm to the deliberative process generally.

    ***Detention Operations.***  The government's first Exemption 5 category consists of discussions of detention operations concerning detainee conduct and related policies and actions. *See* Def.'s Second Mem. at 16–17; McCubbin Decl. ¶¶ 43–47; MulKeen Decl. ¶¶ 16–17. Deputy Mulkeen describes this category as including records in which "General Kelly discusses various operational issues at JTF-GTMO with senior Executive Branch officials, providing his opinions, views, and recommendations as part of continuous consultation with leadership about operational management." Mulkeen Decl. ¶ 16. Deputy Mulkeen states that disclosure would reveal "the back-and-forth consultation process about non-final operational management decisions and thereby inhibit[] officials from frank discussions about the issues and exploring alternatives going forward." *Id.* He further states disclosure of this type of information would hamper deliberations about "potential military courses of action" and "crucial military operational issues," as well as risk "providing the public with an erroneous understanding of agency decision-making at JTF-GTMO." *Id.* ¶ 17.

    These concerns might potentially suggest some foreseeable harm were they not undermined by the government's description of the actual "operational issues" discussed in the withheld records. In the government's initial declaration, Air Force Brigadier General Todd J. McCubbin described this category as including records revealing General Kelly's opinions about "housing and recreational opportunities" for detainees and "certain detainees' behavior," McCubbin Decl. ¶ 43; records in which General Kelly updates senior officials "about detainee behavior, health, and movements, as well as force protection and guard actions," *id.* ¶ 45; and a record "contain[ing] a lengthy discussion of General Kelly's views on how decision-making at

JTF-GTMO should take place," *id.* ¶ 47.  Brigadier General McCubbin's description of these records strongly suggests they are not the sort of records which, if disclosed, pose any reasonably foreseeable harm of hampering future deliberations on "crucial military operational issues."  *Cf.* Mulkeen Decl. ¶ 17.

Moreover, the government's new declaration fails to meaningfully address the eight factors identified in OIP's guidance, and those factors suggest that disclosure of many of these records do not pose a reasonably foreseeable harm to future SOUTHCOM deliberations.  *See* Langford Decl. Ex. U at 2.  Take, for example, the records concerning "housing and recreational opportunities" for Guantánamo  detainees, which are contained in emails dated September 15, 2013, and December 21, 2013, respectively.  *See* McCubbin Decl. ¶ 43; Langford Decl. Ex. PP-1 at 148–50, 153–55 (Records 140 and 143).  The subject-matter of the withholdings suggests that the records implicate relatively inconsequential decisions for which total candor and confidentiality may not be necessary, as well as that disclosure poses a relatively low risk for future process impairment.  In addition, any decision General Kelly discussed in 2013 was likely made years ago, further lowering whatever risk to future deliberations may have existed.  Under OIP's guidance, each of these considerations weigh against a finding of reasonably "foreseeable harm" sufficient to withhold these records under Exemption 5.  *See* Langford Decl. Ex. U at 2. The government offers no argument or evidence on the application of OIP's eight factors to these records or any of the other records in this category.

At a minimum, the government's description of the records in this category indicates that the government cannot properly lump them all into one category because it has not demonstrated how disclosing opinions about the great variety of different operational issues it has lumped together all present the same reasonably foreseeable harm.  Rather, its analysis once again shows

that the withheld information, at best, falls within the deliberative process privilege. It fails to grapple seriously with the need to demonstrate a reasonably foreseeable harm from disclosure.

**Detainee Health.** The government's second category consists of discussions of detainee health. *See* Def.'s Second Mem. at 17–18; McCubbin Decl. ¶ 48; MulKeen Decl. ¶ 18. In the government's supplemental declaration, Deputy Mulkeen describes this category as including records in which Generally Kelly "consults with senior Executive Branch officials and provides his views and recommendations about appropriate next steps with respect to detainees' mental, physical, and emotional health." Mulkeen Decl. ¶ 18. Deputy Mulkeen states that disclosure of these records would result in reasonably foreseeable harm to the agency's deliberative process "by prematurely revealing the details of the consultative process on sensitive issues like detainee health and enteral feeding, thereby inhibiting the Commander of SOUTHCOM from engaging in open and frank discussions about vital issues related to detainees' health and wellbeing." *Id.* Further, states Mulkeen, disclosure would inhibit "[s]enior government officials who are not on the ground at JTF-GTMO [from] . . . solicit[ing] the unguarded views and recommendations of military leadership with operational responsibility in order to make appropriately informed decisions about questions related to detainee health." *Id.*

As an initial matter, the government fails to explain how disclosure of *these records*— which include emails dating back to August 2013—would "prematurely reveal[]" the details of the consultative process on Guantánamo hunger strikes. *See* McCubbin Decl. ¶ 48; *see, e.g.*, Langford Decl. Ex. PP-1 at 1 (Record 1). Whatever consultative process was ongoing as of August 2013 has almost certainly ended.

More significantly, Deputy Mulkeen again fails to account for the eight factors identified by OIP's guidance on the application of the "foreseeable harm" standard to deliberative process

privilege withholdings.  *See* Langford Decl. Ex. U at 2.  These records implicate decisions that were made years ago in response to a very specific issue—the rampant hunger strikes and widespread use of enteral feeding at Guantánamo Bay in 2013.  Deputy Mulkeen's declaration fails to provide any specificity on why disclosing this information years after the fact would "actual[ly] diminish[] [the] deliberative quality," Langford Decl. Ex. U at 2, of future decisions about detainee health.  Would officials in General Kelly's position fear reprisal years down the road for offering candid advice on appropriate steps to take during a hunger strike?  That seems far from "reasonably foreseeable."  In addition, Deputy Mulkeen fails to specify "[t]he significance of any process impairment."  Langford Decl. Ex. U at 2.  Would disclosure of these records lead officials in General Kelly's position to refuse to offer advice at all?  Deputy Mulkeen offers no indication.

Finally, Deputy Mulkeen's stated harms fail to account for the full universe of records lumped together in the detainee health category.  This category includes, for example, Record 255, which "contains General Kelly's advice and recommendation about how to handle media coverage of enteral feeding," McCubbin Decl. ¶ 48, and Record 328, which includes "General Kelly's views on possible changes to the policy on classroom and library services for detainees, *id.* ¶ 49.  These records don't appear to implicate the types of harms identified by Deputy Mulkeen, which concern solely the effects on deliberations related to detainee health and physical wellbeing.

Once again, the government's rationale for this category of withholdings fails to take into account the degree of sensitivity of the information, the status of any decision facing the agency, the significance of any potential process impairment, the age of the information or other factors relevant to demonstrating a reasonably foreseeable harm.

***Detainee Movements.***  The government's third category consists of discussions of detainee movements.  *See* Def.'s Second Mem. at 18–19; McCubbin Decl. ¶ 50; MulKeen Decl. ¶ 19.  The government's new declaration describes these records as containing General Kelly's advice to senior Executive Branch Officials about "logistical and operational issues related to detainee movement orders" in which General Kelly "provides his views about how to proceed, including with respect to media engagement."  Mulkeen Decl. ¶ 19.  According to Deputy Mulkeen, disclosure of these records would discourage SOUTHCOM commanders "from providing the fullest possible picture about the issues at stake with respect to detainee movements."  *Id.*  Specifically, officials "reasonably could be expected to be more guarded in their description of the issues" because "commentary on cooperation with a foreign government or an operational issue that should be shared with senior officials might be harmful if shared more widely."  *Id.*  Moreover, Mulkeen states, because the discussions are predecisional, disclosure could confuse the public, given that the discussions might reflect plans that changed or did not capture "the full reasoning and rationale supporting an agency decision with respect to implementational of a detainee movement order."  *Id.*

As with the detainee health category, Mulkeen's stated harms for the detainee movements category do not appear to apply to the full universe of records included in the category.  The detainee movements category includes Records 50, 83, 136, 145, and 310 in which the government has redacted General Kelly's opinions about "how the government should engage with the media on this subject."  McCubbin Decl. ¶ 50.  Disclosure of this information does not implicate cooperation with a foreign government and seems unlikely to confuse the public about detainee movement orders.  *Cf.* Mulkeen Decl. ¶ 19.

Nor do Mulkeen's stated harms appear to apply squarely to the records that do concern detainee movement orders.  Brigadier General McCubbin described the redacted information in these records as consisting of General Kelly's advice to senior officials "about the logistical requirements necessary to execute a detainee movement order and his recommendations about how to proceed.  McCubbin Decl. ¶ 50.  Mulkeen does not explain how General Kelly's statements about the logistical requirements of detainee transfers risks disclosing information about cooperation with foreign governments, or an operational issue that could be harmful if disclosed.  It's also unclear that disclosure of this sort of information is reasonably likely to result in significant public confusion.

In any event, plaintiffs acknowledge that, to the extent records in this category reflect sensitive communications with foreign government which, if disclosed, could harm foreign relations, that is a factor that weighs in favor of finding a sufficiently reasonable "foreseeable harm" to permit withholding records under OIP's eight factors.  Langford Decl. Ex. U at 2.  However, other OIP factors cut against the existence of foreseeable harm, including the fact that these records concern decisions that were made years ago and concern relatively *sui generis* issues, which lowers the potential for future process impairment.  *See id.*  For these reasons, plaintiffs submit that the balance of considerations weighs against there being a foreseeable harm from disclosure with respect to these records.

***Detainee Communications and Facilities Management.***  The government's fourth category consists of records addressing detainee communications.  *See* Def.'s Second Mem. at 19; Mulkeen Decl. ¶ 20; McCubbin Decl. ¶ 51.  The government's new declaration describes these records as consisting of General Kelly's "opinions about detainee communications policies," discussions of "possible changes to those policies," and the solicitation of "input from

senior government officials."  Mulkeen Decl. ¶ 20.  Deputy Mulkeen states that disclosure of

these records gives rise to reasonably "foreseeable harm" to future deliberations because

disclosure of these pre-decisional materials would "discourag[e] and inhibit[] officials from

freely exchanging ideas about policy details going forward."  *Id.*  Deputy Mulkeen states that,

"[f]or example, if officials are discouraged from freely presenting their views about potential

problems with a detainee communications policy, it is less likely that any such problems will be

addressed, resulting in an entrenchment of a current policy despite officials' potential

recommendations for change."

The government's fifth category consists of records containing discussions of facilities

issues.  *See* Def.'s Second Mem. at 19–20; Mulkeen Decl. ¶ 21; McCubbin Decl. ¶ 52.  The

government's supplemental declaration specifies that these records contain General Kelly's

"opinions and recommendations about the facilities on base and various maintenance issues."

Mulkeen Decl. ¶ 21.  Deputy Mulkeen states that disclosure of these records would inhibit future

Commanders of SOUTHCOM from "freely and frankly discuss[ing maintenance] issues in order

to arrive at proper solutions without worrying about public disclosure that may surface."  *Id.*  For

example, Mulkeen states, "if a particular structure were in poor shape, . . . the Commander of

SOUTHCOM must be free to relate his candid views" to seniors officials.  *Id.*  If an agency is

"unduly guarded" about these sorts of issues, Mulkeen states, agency decision-making may

suffer.  *Id.*

For both of these categories, Deputy Mulkeen's declaration plainly falls short of

providing the meaningful and particularized justification for withholding records this Court held

necessary in its memorandum opinion.  *See* Mem. Op. at 12.  The Court directed the government

to do more than "perfunctorily state that disclosure of all the withheld information . . . would

jeopardize the free exchange of information between senior leaders within and outside of the [DOD]." Mem. Op. at 14. Yet Deputy Mulkeen's declaration for these categories does just that. *See* Mulkeen Decl. ¶¶ 20–21.

Moreover, the government yet again fails to address the eight factors identified in OIP's guidance, *see* Langford Decl. Ex. U at 2, and those factors again suggest that there would be no "foreseeable harm" from disclosure. For example, the records in the detainee communications category concern decisions about detainee communications policies made years ago. *See* McCubbin Decl. ¶ 51. Such decisions do not appear to be "highly sensitive" or "controversial," or seem to "require total candor and confidentiality." Langford Decl. Ex. U at 2. And beyond the generalized concern that any disclosure of internal agency conversations on a particular subject might chill future agency conversations on that subject, the government offers no explanation of how the disclosure of these records would lead to the "actual diminishment of deliberative quality" on future decisions related to detainee communications policies. Langford Decl. Ex. U at 2. Each of these considerations counsels against finding that the government has satisfied the "foreseeable harm" requirement for these categories of records.

*Personnel Management.* The government's sixth category consists of records containing discussions of personnel management. *See* Def.'s Second Mem. at 20–21; Mulkeen Decl. ¶ 22; McCubbin Decl. ¶¶ 53–54. The government's new declaration describes these records as containing General Kelly's "discuss[ions of] his opinions about the performance of personnel, pending personnel actions, and equal opportunity issues, as well as recommendations for how to handle ongoing personnel issues." *Id.* Deputy Mulkeen states that disclosure of these records would interfere with the SOUTHCOM Commander's ability to engage in "frank discussions or personnel performance and problems that are conveyed to those personnel only when final." *Id.*

24

In addition, Deputy Mulkeen states that disclosure "could lead to confusion about the actual reasons and rationales for personnel actions through the release of agency discussions that may not be the ultimate grounds for that action." *Id.*

Several of the OIP's eight factors undermine the government's claim of "foreseeable harm" from disclosure of records in this category. These records concern personnel decisions made years ago, *see* McCubbin Decl. ¶¶ 53–54; the Court has already held that names of specific personnel and information that could be used to identify specific personnel may be withheld under Exemption 6, *see* Mem. Op. at 33–39; and the government has introduced no evidence to suggest that the specific personnel deliberations at issue here are particularly sensitive or controversial, *see* Mulkeen Decl. ¶ 22. Each of these considerations counsels against holding that disclosure of these records could give rise to reasonable "foreseeable harm" to future deliberations. *See* Langford Decl. Ex. U at 2.

***Court and Commission Proceedings.*** The government's seventh category consists of records containing discussions of court and commission proceedings. *See* Def.'s Second Mem. at 21–22; Mulkeen Decl. ¶ 10; McCubbin Decl. ¶¶ 55–56. The government's supplemental declaration describes these records as containing discussions of "how to respond to a court or commission ruling or preparations for an anticipated court or commission ruling." Mulkeen Decl. ¶ 10. Deputy Mulkeen states that senior officials like the SOUTHCOM commander must be free to engage in deliberative discussions of about pending litigation or commission proceedings "in order to properly determine the agency's position in those proceedings." *Id.* In addition, Mulkeen states that disclosure of these records could lead to confusion about the reasons and rationales supporting the agency's position and hinder the agency's ability to engage in frank conversations about how to properly comply with an order. *Id.*

As an initial matter, at least one of Mulkeen's proffered harms does not appear to apply to the withheld records in this case.  The government offers no evidence that any of the withheld records reflect General Kelly contributing to the determination of the agency's position in pending litigation.  *Cf.* Mulkeen Decl. ¶ 10; McCubbin Decl. ¶¶ 55–56.  And tellingly, the government has not invoked the attorney-client privilege or work-product privileges that would seem to more naturally capture records implicating the sort of litigation harm identified by Mulkeen.  Accordingly, the government's concern about harm to deliberations about an agency's position in pending litigation does not appear to be presented here.

In addition, as this Court has already held, records in which General Kelly merely opines "about the merits of [a] military commission ruling in a manner that is not directed toward decision-making as to law or policy . . . is not subject to the deliberative process privilege."  Mem. Op. at 16.  To the extent these records reflect only General Kelly's thoughts on the merits of particular rulings they are not protected by the deliberative process privilege at all.

Finally, several of the OIP's eight factors for determining whether there exists reasonably "foreseeable harm" weigh against finding any such harm.  The records in this category concern decisions made years ago, *see* McCubbin Decl. ¶¶ 55–56; the government has introduced no evidence to suggest that the court and commission orders at issue or the decisions about how to comply with those orders were "highly sensitive" or "controversial," and it is not clear that those decisions "require total candor and confidentiality," Langford Decl. Ex. U at 2.  Nor has the government demonstrated the potential for "actual diminishment of deliberative quality" of future decisions in this vein, beyond parroting a general concern about a vague chilling effect on future deliberations.  *Id.*  Each of these factors counsels against finding that there is a "foreseeable harm" that will result from disclosure of these records.

*Other Issues.*  The government's final category is a catch-all for various deliberations. *See* Def.'s Second Mem. at 22–24; Mulkeen Decl. ¶¶ 24–28; McCubbin Decl. ¶¶ 57–61.  The first six types of deliberations lumped into this category concern visits to Guantánamo  Bay, discussions about engagement with the media, discussions of issues related to interactions with the International Committee of the Red Cross, commentary on Congressional correspondence, General Kelly's opinion about a document, and General Kelly's opinion on an issue raised by a senior official.  *See* Mulkeen Decl. ¶¶ 24–28; McCubbin Decl. ¶¶ 57–61.  To justify withholding records related to each type of deliberation, the government essentially offers the same rote recitation that disclosure of these records would chill full and frank future deliberations.  *See* Mulkeen Decl. ¶¶ 24–28.  But, as this Court has already held, "the government must do more than perfunctorily state that disclosure of all the withheld information—regardless of category or substance—would jeopardize the free exchange of information between senior leaders within and outside of the [DOD]."  Mem. Op. at 14.

The government has also withheld in this category "General Kelly's opinions about a congressional hearing as part of his ongoing consultation with senior leadership about how to manage congressional oversight."  McCubbin Decl. ¶ 61.  The government's supplemental declaration specifies that "disclosure of Executive Branch officials' deliberative discussions about congressional inquiries and oversight would harm the agency's ability to appropriate[ly] engage with Congress by limiting the scope of the discussion among officials and unduly discouraging debate."  Mulkeen Decl. ¶ 28.  But, again, several factors negate the government's claim of "foreseeable harm" from disclosure of this record: it concerns a years' old conversation, there is no evidence that the conversation was particularly sensitive or controversial, and there is

little indication that disclosure would lead to actual diminishment of future similar discussions. *See* Langford Decl. Ex. U at 2.

* * * * *

The Court gave the government a "second bite at the apple," but it tastes the same. Its supplemental submission is as deficient as its first. The government's renewed motion for summary judgment pays little more than lip service to FOIA's new "foreseeable harm" requirement. That is not enough. If the most important change to FOIA enacted through the FOIA Improvement Act of 2016 is to mean anything, it must require agencies to address with particularity the eight factors identified in OIP's guidance, *see* Langford Decl. Ex. U at 2, or some similar set of considerations.

It is telling that the government contends that under the "foreseeable harm" standard it should be permitted to withhold under Exemption 5 the exact same set of records that could properly be withheld if the "foreseeable harm" standard did not apply. The whole point of the new "foreseeable harm" standard is that some documents that could technically have been withheld under FOIA's discretionary exemptions prior to 2016 must now be disclosed. If the Court accepts the government's approach, it will effectively render the "foreseeable harm" standard toothless. Instead, the Court should grant plaintiff's summary judgment motion with respect to the government's Exemption 5 withholdings and order the documents released.

## III.   DOD STILL FAILS TO DEMONSTRATE THAT INTERNAL EXPRESSIONS OF OPINION ABOUT A COURT RULING ARE COVERED BY EXEMPTION 5

As plaintiffs explained in their initial papers, to invoke the deliberative process privilege, an agency must demonstrate that a document is both pre-decisional and deliberative. *Abtew v. U.S. Dep't of Homeland Sec.*, 808 F.3d 895, 898 (D.C. Cir. 2015). To do so, an agency "has the burden of establishing what deliberative process is involved, *and the role played by the*

28

documents in issue in the course of that process." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 868 (D.C. Cir. 1980) (emphasis added). To uphold an Exemption 5 withholding, "a court must be able 'to pinpoint an agency decision or policy *to which the document contributed.*'" *Senate of the Com. of P. R. on Behalf of Judiciary Comm. v. U.S. Dep't of Justice*, 823 F.2d 574, 585 (D.C. Cir. 1987) (emphasis added). A district court in this district described this burden as follows:

> At a minimum, the agency must provide three basic pieces of information in order for the deliberative-process privilege to apply: (1) the nature of the specific deliberative process involved, (2) *the function and significance of the document in that process*, and (3) the nature of the decisionmaking authority vested in the document's author and recipient.

*Nat'l Sec. Counselors v. CIA*, 960 F. Supp. 2d 101, 189 (D.D.C. 2013) (emphasis added).

In its Memorandum Opinion, the Court held that the government failed to demonstrate that General Kelly's opinions about the merits of a judicial ruling could properly be withheld as predecisional deliberative process material. Mem. Op. at 16.[2] Specifically, "[h]aving reviewed *in camera* Records 278, 281, 295, 320, 321, and 335," the Court concluded that "some of the withheld information involves General Kelly merely opining about the merits of the military commission ruling in a manner that is not directed toward decision-making as to law or policy, and that such material is not subject to the deliberative process privilege." Mem. Op. at 16. The Court chose to give the government a second chance to explain how these records relate to deliberations, *id.* at 17, but the government has again failed to justify its withholdings.

---

[2] The government redacted this information in Records 262, 263, 268, 271, 275, 277, 278, 279, 280, 281, 283, 286, 291, 294, 295, 297, 301, 303, 305, 310, 311, 313, 318, 319, 320, 321, 335, and 346. *See* Mulkeen Decl. ¶ 12.

In the government's new declaration, Deputy Mulkeen states that the records reflect General Kelly "considering various options in relation to the military commission's temporary order, from how to address the effects of the ruling to using other means to overturn what General Kelly believed was not only wrong but also illegal." Mulkeen Decl. ¶ 12.  Deputy Mulkeen acknowledges that, as the Court noted, the government made inconsistent redactions of General Kelly's thoughts, but states that the government maintains that the remaining redactions should be upheld.  *Id.* ¶ 14.  In addition, Deputy Mulkeen states that although not every record in this category explicitly contemplates a course of action, all of the withheld records are part of that deliberative process.  *Id.*

Mulkeen's declaration falls short for at least two reasons.  First, it fails to explain how each document withheld by the government contributed to the government's deliberations on how to respond to the ruling at issue.  *See id.*  And second, it fails to explain the nature of General Kelly's decisionmaking authority with respect to responding to the ruling at issue.  *See id.*

More fundamentally, as this Court stated in its prior opinion, it appears that many of these redactions merely redact passages in which General Kelly opines on the merits of the ruling.  Mem. Op. at 16.  This Court should not condone the government's post-hoc attempt to re-cast those passages as part of a more significant deliberation in order to hide them from public scrutiny.

## IV.    DOD STILL FAILS TO DEMONSTRATE THAT CERTAIN RECORDS ARE PROPERLY CLASSIFIED AND THEREFORE SUBJECT TO EXEMPTION 1

As previously explained, Exemption 1 permits agencies to withhold or redact only those records that contain information "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy" and which

are "in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1).  To

withhold classified information, the government must satisfy two substantive criteria set forth in

the current executive order governing classification, Executive Order 13,526.  *See Lesar v. U.S.*

*Dep't of Justice*, 636 F.2d 472, 483 (D.C. Cir. 1980).  First, "classified information must pertain

to at least one of eight subject-matter classification categories."  *Judicial Watch, Inc. v. U.S.*

*Dep't of Def.*, 715 F.3d 937, 941 (D.C. Cir. 2013).  Second, the government must show that

disclosure of such information is reasonably expected to cause "harm to the national defense or

foreign relations of the United States . . . taking into consideration such aspects of the

information as the sensitivity, value, utility, and provenance of that information."  Exec. Order

No. 13,526, § 6.1(l), 75 Fed. Reg. 707, 727 (Dec. 29, 2009).  This harm to national security must

be "identifiable," "describable," and "plausible."  *Judicial Watch*, 715 F.3d at 941.

In its Memorandum Opinion, the Court denied the government's motion for summary

judgment as to four categories of information withheld under Exemption 1: (1) information

concerning detainees' reactions upon learning of their movement to third countries, Mem. Op. at

25–28; (2) discussions of congressional matters related to JTF-GTMO operations, *id.* at 29–30;

(3) a discussion of a detainee movement operation that was postponed, *id.* at 30–31; and (4)

information on intelligence activities related to detention operations, *id.* at 31–32.  In its renewed

summary judgment motion, the government now concedes that the second category of

information is not properly classified and withdraws its assertion of Exemption 1, except with

respect to a detainee movement order number.  Def.'s Second Mem. at 10.[3]  The government

attempts to correct the deficiencies identified by the Court with respect to the other three

---

[3] Plaintiffs do not challenge the government's withholding of the detainee movement order number under Exemption 1.  *See* Def.'s Second Mem. at 10.

categories of information, but the government's new submissions still fall short of carrying its burden with respect to two of them.[4]

The government also renews its motion for summary judgment with respect to certain information about detainees' health, which the Court neither granted nor denied. *Id.* at 8–9. The government offers no new evidence on this point, and, as described below, plaintiffs object for the reasons identified in their initial papers.

***Information Concerning Detainees' Reactions Upon Learning of Their Movement to Third Countries.*** The government asserts Exemption 1 over passages of records where "General Kelly discusses the reactions of detainees upon learning of their transfer." McCubbin Decl. ¶ 27; Def.'s Second Mem. at 9–10. In its initial motion, the government argued that this information was properly classified under Section 1.4(a) of Executive Order 13,526, which permits withholding information pertaining to "military plans, weapons, or operations." The Court denied the government's motion for summary judgment as to these records, concluding that

> the connection between releasing information about the "reactions of detainees" upon learning of their movements from JTF-GTMO and a risk of "enabl[ing] interference in future or similar" detainee movements is tenuous at best. Information about a detainee's feelings or thoughts about his impending transfer would not seem to pose the same security risk as, say, information regarding how or when the detainees are being transferred, or the name of the receiving nation.

Mem. Op. at 26.

In its renewed motion, the government concedes that General Kelly's discussion of the reactions of detainees upon learning of their transfer are not themselves properly classified.

---

[4] Plaintiffs do not challenge the government's supplemental showing that Exemption 1 permits withholding of a discussion in Record 273 of a detainee movement operation that was postponed—*i.e.*, the outstanding "foreign government information" withholding. *See* Def.'s Second Mem. at 10–11.

Def.'s Second Mem. at 9.  Instead, the government's new declaration states that this information

may be withheld because it is "too intertwined with other withheld information that is properly

and currently classified."  Mulkeen Decl. ¶ 6.  Deputy Mulkeen states that

> information detailing detainee reactions is part of a larger
> discussion regarding detainee movements.  And, in many of these
> records, detainees' reactions are discussed within the context of
> how the news of their transfer is or could impact detainee
> operations as well as interagency discussions concerning tentative,
> planned or pending transfers.

*Id.* ¶ 7.  As an example, Deputy Mulkeen states that in Record 331 "General Kelly, in three

sentences, identifies a detainee, his nationality, when he was notified, when he is being

transferred and to where he is being transferred, and the impact the news of his transfer could

have on detention operations."  *Id.*  Deputy Mulkeen states that release of this information could

compromise future transfers.  *Id.*

    As an initial matter, the government fails to substantiate its claim that information

concerning detainees' reactions is so inextricably intertwined with properly classified

information that it cannot be released.  FOIA requires that agencies must "take reasonable steps

to segregate and release nonexempt information," 5 U.S.C. § 552(a)(8)(A)(ii)(II), and that "[a]ny

reasonably segregable portion of a record shall be" made public, *id.* § 552(b).  To demonstrate it

has disclosed all reasonably segregable material, an agency must supply "a detailed justification

for [its] decision that non-exempt material is not segregable."  *Mead Data Cent., Inc. v. U.S.*

*Dep't of Air Force*, 566 F.2d 242, 261 (D.C. Cir. 1977); *see, e.g.*, *Defs. of Wildlife v. U.S. Border*

*Patrol*, 623 F. Supp. 2d 83, 90 (D.D.C. 2009) (same).  "A blanket declaration that all facts are so

intertwined to prevent disclosure under the FOIA does not constitute a sufficient explanation of

non-segregability.  Rather, for each entry the defendant is required to specify in detail which

portions of the document are disclosable and which are allegedly exempt." *Defs. of Wildlife*, 623 F. Supp. 2d at 90.

Nothing in Deputy Mulkeen's satisfies this burden.  The declaration never adequately explains why General Kelly's discussions of detainees' reactions to news of their transfer cannot be segregated from properly classified information.  *Cf.* Mulkeen Decl. ¶¶ 6–7.  For example, Deputy Mulkeen does not explain why, with respect to Record 331, the government cannot redact (a) the name of the detainee, (b) his nationality, (c) the date of his notification, (d) the date of his transfer, (e) the detainee's destination, and (f) the impact of the news on detention operations, while disclosing the detainee's reaction.  *Cf. id.* ¶ 7.  Deputy Mulkeen offers only the conclusory assertion that this cannot be done.  That is not enough.

More significantly, it is not at all apparent that the redaction in Record 331 is representative of the government's other withholdings in this category.  Nothing in Deputy Mulkeen's declaration indicates that Record 331 even contains the sort of detainee reaction description described by Brigadier General McCubbin in the government's initial papers. *Compare* McCubbin Decl. ¶ 27 *with* Mulkeen Decl. ¶ 7.  Given that there are only nine records at issue in this category,[5] it should be easy enough for the government to provide document-by-document support for each of its withholdings.  Its failure to do so, despite a second opportunity to do so, is a failure of proof that should preclude continued withholding of this information.  At a minimum, plaintiffs respectfully request that the Court review these nine document *in camera* to weigh the government's claim of non-segregability.

---

[5] The records in this category include Records 131, 144, 180, 279, 324, 325, 331, 340, and 344.  Mulkeen Decl. ¶ 6.

***Information on Intelligence Activities Related to Detention Operations.***  The government asserts Exemption 1 over "information on intelligence activities" related to "detention operations."  McCubbin Decl. ¶ 36; Def.'s Second Mem. at 11–12.  The government argues that this information is properly classified under §1.4(c) of EO 13,256, which permits the government to keep secret information pertaining to "intelligence activities (including covert action), intelligence sources or methods, or cryptology."  The Court rejected the government's initial summary judgment motion with respect to these records because it failed to show either that the records properly fall under § 1.4(c) of EO 13,256 or that disclosure would lead to the requisite risk of harm to national security.  Mem. Op. at 31.  The government has now submitted a classified, *ex parte* declaration to address the Court's concerns, to which plaintiffs are not privy.  Def.'s Second Mem. at 11–12.

At the outset, plaintiffs object to the government's insistence on providing all of its further justifications for withholding these records in an *ex parte* declaration.  An agency may justify its withholdings through the use of *ex parte*, sealed declarations only when public justification "would threaten to reveal the very information for which a FOIA exemption is claimed."  *Roth v. U.S. Dep't of Justice*, 642 F.3d 1161, 1185 (D.C. Cir. 2011).  Even then, "an agency is still required to provide *as much public explanation as it can* without giving away the information it is trying to withhold."  *Id.* (emphasis added).  Limiting *ex parte* justifications is important, because public explanations "allow[] for adversarial testing of the agencies' claims, which helps focus the court's attention on the most important issues in the litigation and may reveal not otherwise apparent flaws in the agencies' reasoning."  *Id.*

In this case, it is not at all apparent why the government cannot provide some public version of its supplemental account of why the Court should find these documents to be properly

classified.  To the extent that portions of the government's sealed declaration can be disclosed without revealing the information sought to be withheld, the government should be required to do so through a publicly filed, non-classified version of the declaration.

Regardless, for the reasons laid out in plaintiffs' initial papers, the information withheld here does not appear to be properly classified.  *See* Pls.' Mem. at 33–34.  As previously explained, the government has failed to demonstrate how General Kelly's concern about the impact of potential declassification of information on "detention operations," or information about "specific detainee conduct" and "the impetus behind noncompliant activity," McCubbin Decl. ¶ 36, in any way pertain to "intelligence activities" subject to classification under § 1.4(c) of EO 13,256.  In addition, the government has failed to explain how disclosure of information such as the "communal and single-cell distribution" of the prison facility," along with "the impetus behind . . . noncompliant activity," McCubbin Decl. ¶ 36, could reasonably be expected to cause serious damage to the national security.

*Detainee Health.*  Finally, the government renews its motion for summary judgment with respect to details about detainee healthcare and hunger strikes.  Def.'s Second Mem. at 8–9.  The government offers no new evidence in support of these withholdings, *see id.*, and plaintiffs rely on their initial papers regarding the impropriety of those withholdings, *see* Pls.' Mem. at 25–28.

## V.   DOD OFFICIALLY ACKNOWLEGED TALLIES OF HUNGER STRIKERS AND FORCE-FED DETAINEES AND THESE MAY NOT BE WITHHELD

As demonstrated in the declaration of Carol Rosenberg, sworn to January 2, 2019, the government has routinely acknowledged officially the tallies of hunger strikers and instances of enteral feeding at Guantánamo Bay.  The Court previously upheld much of the government's withholding of this data on the ground that plaintiffs failed to demonstrate official acknowledgement of the tallies.  Mem. Op. at 23–24 n.9.  The new declaration provides the

evidence the Court previously found missing, and plaintiffs respectfully request reconsideration of this aspect of the earlier order.[6]

There is no dispute that the government cannot properly withhold under FOIA information that it has officially acknowledged elsewhere.  *See, e.g.*, *ACLU v. U.S. Dep't of Def.*, 628 F.3d 612, 620 (D.C. Cir. 2011).  To be officially acknowledged "(1) the information requested must be as specific as the information previously released; (2) the information requested must match the information previously disclosed; and (3) the information requested must already have been made public through an official and documented disclosure."  *Id.* at 620–21.

Here, the government has asserted Exemption 1 over portions of records in which "General Kelly identifies the number of hunger strikers, highlighting whether there is an increase or decrease in numbers, and the underlying reason for any such increase and decrease." McCubbin Decl. ¶ 26.  In moving previously, plaintiffs cited to a *Miami Herald* database that tracked the daily number of hunger strikers and instances of force-feeding between March and December 2013, which is maintained by Rosenberg, and formerly Lazaro Gamio, to demonstrate that the government routinely released and officially acknowledged the number of hunger strikers and instances of enteral feeding.  *See* Pls.' Mem. at 26; Pls.' SMF ¶ 41.  When the government objected that the newspaper's database does not itself meet the requirements for

---

[6] Under Federal Rule of Civil Procedure 54(b), the Court's September 27, 2018, Memorandum Opinion and Order may be revised any time prior to entry of final judgment.  *See* Fed. R. Civ. P. 54(b) ("[A]ny order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."); *see, e.g.*, *Filebark v. U.S. Dep't of Transp.*, 555 F.3d 1009, 1013 (D.C. Cir. 2009) (explaining that the law of the case doctrine does not apply prior to entry of final judgment).

official acknowledgment, plaintiffs explained that the database exhaustively documents tallies received only from the government itself.  Pls.' Reply at 14, ECF No. 24.  Providing one example of an official acknowledgment, plaintiffs submitted the government's disclosure of the information contained in the May 15, 2013 database tally.  *Id.*  The Court granted plaintiffs' motion for summary judgment on the May 15, 2013, tally, concluding that that tally was "officially acknowledged," but granted the government summary judgment with respect to the rest of the tallies because plaintiffs "failed to bring to the court's attention the specific official disclosures that support each count in the tally" and therefore did not overcome DOD's invocation of Exemption 1."  Mem. Op. at 23–24 n.9.

As the Rosenberg declaration affirms, all of the information in the tallies reported on the *Miami Herald*'s chart was obtained exclusively from official government sources.  *See* Rosenberg Decl.  Early on in 2013, Rosenberg obtained official figures by calling the Guantánamo Bay detention center's Office of Public Affairs.  *Id.* ¶ 5.  By at least March 19, 2013, the exercise of contacting the Guantánamo detention center's public affairs office every day to obtain official tallies of hunger strikers and instances of force-feeding became so routine that Rosenberg began to email the public affairs office to obtain the tallies rather than call.  *Id.* ¶¶ 8–10 & Ex. C.  Between March 2013 and December 2, 2013, the government officially acknowledged the number of hunger strikers and instances of forced-feeding on over 200 separate occasions.  *See id.* ¶ 10 & Ex. C.  For this reason, the number of hunger strikers and force-fed detainees at Guantánamo between March and December 2, 2013, has been officially acknowledged and may not properly be withheld.

**CONCLUSION**

For the foregoing reasons, the Court should deny the government's renewed motion for summary judgment and grant plaintiffs' renewed cross-motion for summary judgment and partial reconsideration.

Dated: January 4, 2019                      Respectfully Submitted,

                                            /s/ David A. Schulz

                                            David A. Schulz (Bar No. 459197)
                                            John Langford, supervising attorney
                                            MEDIA FREEDOM & INFORMATION
                                                ACCESS CLINIC
                                            ABRAMS INSTITUTE
                                            Yale Law School[7]
                                            919 Third Avenue, 37th Floor
                                            New York, NY 10022
                                            Tel: (212) 850-6103
                                            Email: schulzd@ballardspahr.com

                                            *Counsel for Plaintiffs*

---

[7] This motion has been prepared in part by a clinic associated with the Abrams Institute for Freedom of Expression and the Information Society Project at Yale Law School, but does not purport to present the school's institutional views, if any.

### CERTIFICATE OF SERVICE

I certify that on January 4, 2019, I electronically filed the foregoing memorandum using the Court's CM/ECF system.

/s/ David A. Schulz
David A. Schulz (Bar No. 459197)
919 Third Avenue, 37th Floor
New York, NY 10022
Tel: (212) 850-6103
Email: schulzd@ballardspahr.com

*Attorney for Plaintiffs*